# KYLE WATSON *v.* STATE OF MARYLAND

[No. 34, September Term, 1979.]

*Decided November 6, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. COLE and DAVIDSON, JJ., concur in the result.

The General Assembly of Maryland created the felony of rape in the second degree by Acts 1976, ch. 573. As amended by Acts 1977, ch. 292, effective 1 July 1977, a person is guilty of that crime "if the person engages in vaginal intercourse [1] with another person ... [w]ho is under 14 years of age and the person performing the act is at least four years older than the victim." Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.) Art. 27, § 463 (a) (3). Upon conviction, a penalty of imprisonment for a period of not more than 20 years is authorized. § 463 (b).

On 13 October 1977, Kyle Watson, 21 years of age, engaged in vaginal intercourse with Joyce Deskins, 13 years of age. He was charged with the offense of rape in the second degree by indictment returned 15 November 1977, tried at a court trial in the Criminal Court of Baltimore, convicted on 2 May 1978, and sentenced to 20 years in care of the Commissioner of Correction on 2 June 1978. The judgment was affirmed on direct appeal to the Court of Special Appeals in an unreported opinion. We granted Watson's petition for the issuance of a

---

1. " 'Vaginal intercourse' has its ordinary meaning of genital copulation. Penetration, however slight, is evidence of vaginal intercourse. Emission of semen is not required." Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.) Art. 27, § 461 (g).

writ of certiorari. The question presented was whether the sentence imposed constituted cruel and unusual punishment or was otherwise improper.

## I

The evidence adduced at the trial established that Joyce had freely and voluntarily engaged in the sexual activity. She was in love with Watson, and on numerous occasions had invited him to come to her home, where she lived with her parents and brother. In the early afternoon of 13 October 1977 he arrived at her house in response to an invitation extended a week before. Her parents, who were working, and her brother were not at home. She led Watson to her bedroom. They undressed and, in her bed, had sexual relations with her full cooperation. Afterwards, "[w]e just laid there, and then he got up and got dressed and kissed me, and then he left." He knew how old she was. Several days later she discussed the incident with her cousin. The cousin recounted what had happened to her mother, Joyce's aunt, and the aunt told Joyce's mother, who informed the police.

## II

To aid in the imposition of punishment, the trial court requested a pre-sentence medical report and a pre-sentence probation report at the conclusion of the guilt phase of the trial. These reports were in the hands of the court and considered by it at the penalty stage of the trial. The medical officer recommended that Watson "receive a maximum sentence of incarceration." This recommendation was supported by the evaluation of Watson by the doctor upon "repeated psychiatric examination" and psychological testing. The court observed that "the medical office was particularly disturbed about this. They personally came to see me about this." The Division of Parole and Probation "[b]ased upon [Watson's] extensive prior record, his mental health history, the nature of the instant offense, and his potential threat to society," recommended that a sentence be

imposed. It "further recommended that if possible, [Watson] be incarcerated at Patuxent whereby he can receive psychiatric management as previously indicated in his earlier history." The court stated that according to both reports Watson was antisocial. There are "obviously defects in his personality. . . . He is a threat to society. He is a danger to society." It was because of this that the court emphatically rejected defense counsel's suggestion that any sentence be suspended and probation granted. "[U]nder no conditions will there be a suspended sentence. . . . Clearly, both reports say that he should receive incarceration, and one was vehement in saying it should be the maximum because he is that much of a danger to society." Thus, the issue was "where and how long." "I asked the medical office if [Patuxent] was appropriate in the case and they did say that it would be fine." Then the court declared: "Now I can only do that if the defendant wishes it." This belief of the court, and its subsequent action apparently predicated upon that belief, requires that the sentence imposed be vacated and that the case be remanded for resentencing.

When the court indicated that it could send Watson to the Patuxent Institution only if Watson wished it, defense counsel said: "Well, from my past experiences with the Patuxent Institution, I personally would not recommend such institution for the defendant and, of course, I would talk to his family about that and to the defendant." Further discussion followed, during the course of which the court observed: "There is the possibility of being released sooner if he is better and it is possible he may get out sooner if he is in a regular institution." At the end of the colloquy between the court and defense counsel, the court reminded defense counsel that he wanted to talk to Watson about the possibility of confinement in Patuxent. The transcript of the proceedings reflects that a "brief pause" ensued, "following which the proceedings . . . resumed." Defense counsel reported to the court that he had "discussed the situation with [Watson] and his family." Before he made known their decision, however, he again suggested probation, this time upon the condition that Watson receive "medical attention at a private

institution, in University Hospital or one of the other hospitals —." The court reiterated that Watson could not expect to be put on probation with his record and reviewed that record in detail. Defense counsel then informed the court with respect to the attitude of Watson and his family toward Patuxent:

> Well, I discussed the "where" with the defendant and his family and, of course, his father who was a guard at Patuxent in no way wants his son to go there because of his past experience with Patuxent. Under no circumstances would he want his son to go there. So, therefore, we only have one alternative for the Court to do. . . .

It is manifest that the court proceeded thereupon on the belief that inasmuch as Watson did not wish to be sent to Patuxent, the resources of that institution could not be called upon as to him. After allocution had been offered Watson and declined, the court said:

> Even the maximum sentence in this case . . . is such that under our present parole guides means almost nothing. I think that if he really improves or some change is seen in him, he'll be out in a reasonable time anyway. I agree with you that there is some mitigating circumstance in [Joyce's] attitude and her appearance, such that when it is combined with his general behavior in society it really makes very little difference. She was just another victim — an easy one. That is true, but even if it was not an easy one he would commit the crime, I think, if I am to believe the reports of the probation department and the medical office that he is anti-social. He is a threat to society. He is a danger to society. While I have that difficulty and I am hesitant to accept their advice, why do we get them if we don't accept them?

The court answered this rhetorical question:

> I know that you can answer it in more ways than one, and I have not always followed their

recommendations to the letter. In the last case they gave a little inch; the medical report said if you do decide because he has no prior record, but it should be intensive probation.

There is no door left open in this man's case with the reports. Clearly, both reports say that he should receive incarceration, and one was vehement in saying it should be the maximum because he is that much of a danger to society. I think I have to look at that, too.

As I said before, I don't know what makes him do these things and while he is not insane — being anti-social is a kind of illness — there is no question. How do you correct that? Only prisons correct that, if they do.

I think in view of what the reports say I have no alternative, and the sentence will be twenty years to the Commissioner of Correction.

Defense counsel asked the court to reconsider the punishment. "[I]t is a very harsh sentence. You are taking into consideration the possibility of him being released if he behaves himself, but there is no guarantee that he will." The court replied: "If he doesn't [behave himself], then the medical report indicates he shouldn't be [released]." Defense counsel responded: "But the reason they're releasing them so fast, as the court knows, is because of the overcrowded conditions." The court indicated that an early release was the responsibility of the parole authorities. The court then explained the procedures for appeal of the judgment, for sentence review and for requesting the court for a reduction of the sentence. Sentence was designated to begin at a time which afforded credit for the period Watson had spent in jail awaiting trial.

## III

Within the larger group of violators of the criminal law whose criminality is related to or results from

mental abnormalities, it has long been recognized
that there, in fact, exists a smaller group who are
legally sane (under the M'Naghten, Durham or other
accepted tests for sanity in criminal cases) and
therefore responsible for their acts but who
nevertheless persist in antisocial behavior, have
either deficient intellect or emotional unbalance, or
both, and are lacking in control. Those in this group
demonstrate a persistent tendency to repeat their
crimes and experience dictates that they are not
usually influenced by conventional penological or
reformative measures. For many years informed
criminologists, penologists, jurists and psychiatrists
have recognized that individuals falling within this
category, while constituting an acute menace to
society because of their criminal behavior, are in fact
suffering from mental illness and should be dealt
with in a manner other than are conventional
criminals. [*Director v. Daniels,* 243 Md. 16, 30-31,
221 A.2d 397, *cert. denied sub nom. Avey v. Boslow,*
385 U.S. 940 (1966).

We pointed out in *Daniels* that Maryland, after considerable
research and study by a number of commissions and
committees, pioneered in this approach with the adoption over
a quarter of a century ago (Acts 1951, ch. 476) of what is
generally referred to as the Defective Delinquency Law,
codified in the 1957 Maryland Code as Article 31 B. *See Gee
v. State,* 239 Md. 604, 609, 212 A.2d 269 (1965). Patuxent
Institution was established as the facility where defective
delinquents were to be confined and treated. Md. Code (1957,
1976 Repl. Vol.) Art. 31 B, § 1. The United States Court of
Appeals for the Fourth Circuit said of this legislation:

"[T]he statute rejects the age old concept that every
legally sane person possesses in equal degree the
free will to choose between doing right and doing
wrong. Instead it substitutes the concept that there
is a category of legally sane persons who by reason
of mental or emotional deficiencies "evidence a

propensity toward criminal activity," which they are incapable of controlling. For those in the category who are treatable it would substitute psychiatric treatment for punishment in the conventional sense and would free them from confinement, not when they have "paid their debt to society," but when they have been sufficiently cured to make it reasonably safe to release them. [*Sas v. Maryland,* 334 F.2d 506, 516 (4th Cir. 1964).]

The court in *Sas* thought that "[w]ith this humanitarian and progressive approach to the problem no person who has deplored the inadequacies of conventional penological practices can complain." 334 F.2d at 516. Complaints, however, did develop, and criticism intensified as the years passed. Dissatisfaction was not with the objectives of the law but with their fulfillment. Although the statute incorporated many safeguards, *e.g.,* provisions for examinations, §§ 6-7; hearings, § 8; review, § 10; and appeal, § 11; many persons found serious fault with the dictate that the defective delinquent was to be confined "for an indeterminate period without either maximum or minimum limits," and that "[i]n such event, the sentence for the original criminal conviction, or any unexpired portion thereof, shall be and remain suspended," so that the defective delinquent would remain in the custody of Patuxent Institution. § 9 (b). Thus, it was not unusual for a person to remain in confinement long after his original sentence had expired.

The mounting criticism ultimately spurred legislative action. The Defective Delinquent Law was repealed by Acts 1977, ch. 678, effective 1 July 1977. The entire concept of the former law was not entirely abandoned, however. A new Article 31 B was enacted, entitled "Patuxent Institution." The institution was retained "to provide efficient and adequate programs and services for the treatment and rehabilitation of eligible persons." § 2. " 'Eligible person' means a person who (1) has been convicted of a crime and is serving a sentence of imprisonment with at least three years remaining on it, (2) has an intellectual deficiency or emotional imbalance, (3) is likely to respond favorably to the programs and services

provided at Patuxent Institution, and (4) can be better rehabilitated through those programs and services than by other incarceration." § 1 (g). Under the old law a request could be made that a person meeting certain criteria be examined for possible defective delinquency. § 6 (a). Section 6 (b) spelled out who could make such requests:

> The request for such examination may be made by the Department of Correction or by the State's attorney or assistant State's attorney who prosecuted the person for a crime or offense specified hereinabove in this section, on any knowledge or suspicion of the presence of defective delinquency in such person. Such person himself, or his attorney in his behalf, may make such a request of the court. Whenever a request for examination comes from any such source the court may order such person to be examined by the institution for defective delinquents to ascertain if he or she is a defective delinquent. The court also may make such an order on its own initiative. A copy of any order for examination shall be served upon the person to be examined.

Under the new Art. 31 B, § 8 (a)

> Any person who is serving a sentence of imprisonment following conviction of a crime, has more than three years remaining to serve on his sentence, and has not been evaluated by or confined at the Institution within the preceding three years* may be referred by the Commissioner [of Correction, *see* § 1 (d)] to the Institution for evaluation as to whether he is an eligible person upon recommendation of the sentencing court, upon application to the Commissioner by the State's attorney of the county in which the person was last convicted, upon application by the inmate, or upon recommendation of his staff.

Whereas under the old law referral to Patuxent for examination as a possible defective delinquent was upon

order of the court, under the new law referral to Patuxent for evaluation is within the discretion of the Commissioner of Correction. The sentencing court's activity goes no further than a recommendation to the Commissioner that the person be evaluated. But the court may make such a recommendation whether or not the defendant wishes it. Except to the extent that he may apply to the Commissioner, the statute does not require the defendant's consent to the referral and gives no indication that his wishes should play any part in the decision of the Commissioner to refer him to Patuxent for evaluation. The court here was wrong when it said that Watson could be sent by it to Patuxent only if he so wished.

This Court has disclaimed "any right to oppose the judicial power against the legislative power to define crimes and to fix their punishment, except where the power of the Legislature encounters in its exercise a constitutional prohibition, and in such case an imperative duty is invoked." *Delnegro v. State,* 198 Md. 80, 89-90, 81 A.2d 241 (1951). We see no constitutional prohibition in the legislature authorizing a sentence of not more than 20 years upon conviction of rape in the second degree. Art. 27, § 463 (b) prescribing the punishment is clearly constitutional on its face. And for decision in this case, we need not reach the question of whether the statute as applied to Watson was unconstitutional as cruel and unusual punishment under Md. Const., Declaration of Rights, Art. 16 and Art. 25, and U.S. Const. amend. VIII, which flows to the states through the Fourteenth Amendment. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861 (1977); *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417 (1962).

Although the authority of a trial judge in the judicial system of Maryland with respect to the imposition of sentence, and, our role in reviewing the legality of a sentence imposed has been stated in a variety of ways, the principles were succinctly stated by Digges, J., speaking for the Court in *Johnson v. State,* 274 Md. 536, 336 A.2d 113 (1975):

> [I]n this State, the awesome responsibility of imposing sentence is within the exclusive domain of the trial judge (subject to modification pursuant to

the review of criminal sentence provision contained in Maryland Code (1957, [1976 Repl. Vol., 1979 Cum. Supp.]) Art. 27, §§ 645 JA-645 JG), and thus his determination in this regard cannot be reevaluated upon appellate review unless either it is based upon an impermissible consideration, ... or is passed in violation of statute...." [*Id.* at 538 (citations omitted).]

Here the term imposed by the trial court did not exceed the maximum set by statute for the offense of which Watson was convicted and was, therefore, not in violation of the duration of imprisonment allowable by law. We shall assume for the purpose of decision that the court below exercised its discretion in imposing sentence. *Compare, Williamson v. State,* 284 Md. 212, 395 A.2d 496 (1979). It would appear to be, however, that the court's determination of the length of the term of imprisonment was based upon an impermissible consideration, not because it was in any way motivated by passion, prejudice, ill-will or any other unworthy motive, rather than by a sense of public duty, but because of the court's mistaken belief as to the status of the law. The court's comments indicated that it would have preferred that Watson receive the treatment offered by the Patuxent Institution if found to be an eligible person. Clearly, it did not pursue any steps which could have been taken to have Watson evaluated to determine his eligibility, because it believed it had no authority to do so without Watson's consent. However, we cannot be sure to what extent this mistaken belief actually affected the court's ultimate determination to impose the maximum sentence permitted by law. It may be that the reasoning of the court was that if there was no possibility, in light of Watson's stand, that he would receive the treatment offered by the institution,[2] and by reason thereof be released from confinement as no longer an unreasonable

2. An individualized written treatment including treatment goals plan shall be prepared, filed with the director, and implemented for each eligible person. The treatment plan and the inmate's progress under it shall be reviewed by the director or an associate director for treatment at appropriate intervals but at least every six months. [§ 9 (c) of new Art. 31 B.]

risk on society, new Art. 31 B, § 11 (b) (2), the public should be protected from him for the longest period possible. Therefore, as in *Johnson,* in order to be sure that Watson's sentence is free of taint, we shall vacate the sentence imposed and remand the case so as to afford the court an opportunity to sentence Watson again, taking into account that it may recommend to the Commissioner of Correction that he be sent to Patuxent Institution for evaluation to determine whether he is eligible for admittance so as to receive the benefits of treatment and services available at the institution.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court with instructions to vacate the sentence which was imposed by the Criminal Court of Baltimore and then remand the case to that court with direction that it impose a new sentence arrived at in conformity with this opinion.*
>
> *Pursuant to Md. Rule 882f, costs are not reallocated as part of the judgment of this Court.*

Cole and Davidson, JJ., concur in the result.