607 A.2d 590

**Robert Daly ANGELL**

v.

**Joseph HENNEBERRY, et al.**

**No. 1905, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

June 2, 1992.

280

Dana Whitehead (Gerald R. Walsh on the brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart M. Nathan, Asst. Atty. Gen., on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., and BISHOP, and ALPERT, JJ.

WILNER, Chief Judge.

The legal issue before us in this appeal is simple and straightforward. Appellant, Robert Angell, has been an inmate at Patuxent Institution since August, 1977.[1] In 1990, the authorities at Patuxent decided that he should not remain there any longer and proposed to transfer him to the jurisdiction of the Division of Correction for placement in one of its institutions. Under internal procedures followed by Patuxent and, as we shall hold, under the "due process" clause of the Fourteenth Amendment, Angell is entitled to a hearing to determine whether he should be transferred. The sole question is whether he is entitled to the assistance of counsel at that hearing. Although the record before us gives us great concern over the manner in which Mr. Angell has been treated by Patuxent, our conclusion is that he is *not* entitled to counsel at that hearing.

## The Facts

Angell came to Patuxent as the result of a number of crimes that he committed during the period August, 1975—

---

1. Angell was actually transferred to Patuxent for evaluation in September, 1976. The evaluation was completed and he was accepted as an inmate in August, 1977.

March, 1976, when he was 17–18 years old. In August, 1975, he stole a shotgun from a house that he burglarized. Later that month, he shot and killed a young boy with the gun; why he did that is not revealed in the record before us. In March, 1976, he used the gun to rob a bank and, in an ensuing attempt to elude capture, he shot and killed two Montgomery County police officers. Convicted subsequently in the Circuit Court for Montgomery County of three counts of first degree murder, he was sentenced to three consecutive sentences of life imprisonment, the trial judge suggesting at the time that Angell should "never be considered for parole." Notwithstanding the judge's comment, Angell would be eligible for parole in the year 2010.

At the time Angell was sentenced, Patuxent was governed by the Defective Delinquency law as set forth in art. 31B of the Md.Code (1976 Repl.Vol.). A person could be admitted to that institution only after conviction of a crime and upon a finding by a judge or jury that he was a "defective delinquent," as defined in the law. Upon such a finding, the finite sentence imposed by the criminal court was suspended in favor of an "indeterminate" sentence, i.e., the prisoner remained at Patuxent until either the institution or another court or jury determined that he was no longer a defective delinquent, in which event he would be released from confinement. Although most inmates resisted admission to Patuxent because of that indeterminate sentence, those with extraordinarily long sentences, such as Angell's, sometimes looked favorably upon Patuxent because of the prospect that they could be released well before they would likely be paroled or serve their original finite sentence in one of the prisons operated by the Division of Correction. By order of the Circuit Court for Montgomery County, Angell was sent to Patuxent in September, 1976 for evaluation to determine whether he met the definition of a defective delinquent.

While Angell was undergoing his evaluation, the General Assembly made a number of significant changes in the law governing Patuxent. *See* 1977 Md.Laws, ch. 678, rewriting

art. 31B in its entirety. The concept of defective delinquency, and with it the indeterminate sentence, was repealed, and Patuxent was recast more as a treatment facility designed to rehabilitate inmates who could benefit from the program and were willing to cooperate with the treatment staff than as a warehouse for persons too incorrigible to be released back into society. Admission was available only to an "eligible person," defined as one who (1) was serving a sentence with at least three years remaining on it, (2) had an intellectual deficiency or emotional imbalance, (3) was likely to respond favorably to the programs and services provided at Patuxent, and (4) could be better rehabilitated through those programs than by other incarceration. *See* art. 31B, § 1(f); *Watson v. State,* 286 Md. 291, 298–99, 407 A.2d 324 (1979).

Pursuant to the transition provisions in the 1977 Act, Angell was evaluated in accordance with the new criteria and was accepted as an eligible person. In the ensuing years, he made much progress, receiving his G.E.D., completing various trade courses, and, in 1986, receiving his grade 1 stationary engineer's license. His work in the power plant was rated as good to excellent. In 12 years, he had but two infractions—one in November, 1976 for possessing a "carved" bar of soap that was regarded as contraband and one in 1984 for referring to a guard as "ugly." He had been on the "fourth level"—the level of highest progress—since 1979. Because of the nature of his crimes, however, and the publicity they had engendered at the time, his requests for leave days were denied until April, 1988.[2] At that time, accepting the treatment unit's conclusion that Angell was "no longer a danger to society and should begin a slow, gradual and structured re-entry into the community," the Institutional Board of Review, charged under the law with making such decisions, granted

---

2. The treatment unit recommended leave day status for Angell in August, 1987, but it was several months before the Board acted favorably on that recommendation.

him a series of 15 day-long leaves, during which he was allowed to leave the institution and spend the day with his family. This action was taken in the face of a 1987 amendment to art. 31B, presumably prospective only in application, excluding from the definition of "eligible person" a person, like Angell, who was serving two or more life sentences for murder. The leave days, taken during the period from April 9 to November 5, 1988, were without incident; no record exists of any misbehavior or violations on Angell's part.

Unfortunately for Mr. Angell, his leave status and that of other Patuxent inmates coincided with a number of wholly extraneous events that led to a significant reshaping of the Patuxent program. One of those events was the Presidential campaign of 1988 in which one Willie Horton became a household name and a symbolic object of great alarm. Another, feeding on the first, was the conduct of Patuxent inmate James Stavrakas, who, emulating Horton, escaped from a work release detail and was charged with raping a woman. Those events subjected the institution's leave and work release programs to immediate and heightened public scrutiny. On November 29, 1988, the Police Association of Montgomery County filed suit against the then-director of Patuxent seeking an order requiring that the institution's leave policy be suspended, that Angell's leave status in particular be cancelled, and that Angell's eligibility to remain at Patuxent be reevaluated. Shortly thereafter, Secretary of Public Safety and Correctional Services Bishop L. Robinson was widely quoted as being openly critical of Patuxent's leave program. As a result of an *ex parte* order entered in the lawsuit and pressure brought to bear on the institution, the leave program was administratively suspended in December, 1988, and the institution's director eventually resigned.[3]

---

3. Once the leave policy was suspended and it became clear that the whole Patuxent program would be reevaluated, the Police Association

More permanent changes were made by the General Assembly in its 1989 session. By 1989 Md.Laws, chs. 6 and 7, both the governing structure and the programs of Patuxent were substantially revised. The Board of Review, which decided such things as leave status, parole, and continued participation in the Patuxent program, was reconstituted, and victims were given the right to comment on proposed leave status and parole. Moreover, in an uncodified section 5, the Acts required that, before reinstituting the work release and leave programs at Patuxent, the Secretary of Public Safety and Correctional Services had to review the status of each eligible person who had been on work release or had leave status to determine whether the inmate was a threat to public safety. In a new section 4 added to art. 31B, the Secretary was directed to adopt regulations to carry out the provisions of the article. Except for regulations "pertaining only to routine internal management of the Institution," those regulations were to comply with the Administrative Procedure Act (APA). The new Acts, declared to be emergency measures, took effect on March 20, 1989, when signed by the Governor.

Under the 1977 law, the director of the institution was authorized, but not directed, to adopt regulations. Although nothing was said then in art. 31B about compliance with the APA, it seems clear that a regulation adopted by the director was subject to and had to comply with the Act. *See* State Gov't art., § 10–101(e), defining "regulation," and § 10–102, setting forth the scope and applicability of the law. Nonetheless, in 1985 the director issued a number of regulations dealing with the procedure for reviewing the status of eligible persons without complying with the Act. The most glaring omission is that they were not published in either the Maryland Register or in COMAR, as required by §§ 10–114 and 10–117; nor is there any indication that they were submitted to and approved by the Attorney

seemed to lose interest in the case, and it remained dormant. Its current status is not clear from the record.

General, as required by § 10–107. One of those regulations, identified as PIR No. 240–1, was designed "[t]o establish the duties and powers of the Institutional Board of Review to the extent allowed by law." It required, in pertinent part:

"A. *Annual Review*—The Board of Review shall review the eligibility status of each eligible person at least once each year, and shall find either that the E.P. remains eligible or notify the E.P. that his eligibility for the treatment program will be reconsidered at the next Board of Review session for his unit, at which time the E.P. may be returned to the Division of Correction within ninety (90) days of notice being made to that agency."

and

"F. *Special Eligibility Reviews*—The Board of Review shall review the eligibility status of any E.P. when ... (3) the treatment unit recommends that an E.P. no longer remains eligible for the program ... and shall find either that the E.P. remains eligible or that the E.P. is no longer eligible and is to be returned to the Division of Correction within ninety (90) days of notice being made to that agency."

A second regulation (PIR No. 240–4) provided for three kinds of Board of Review sessions: regular sessions, held for the purpose of conducting annual reviews and certain other business; executive sessions, held for the purpose of deciding special requests and other non-administrative matters not requiring the presence of the eligible person; and administrative sessions, held for the purpose of reviewing policy and other business of an administrative nature not requiring the presence of the eligible person. A third regulation (PIR No. 240–5), designed to "establish guidelines regarding the necessity of Board of Review hearings and the presence of the interested inmate/parolee," provided, in pertinent part, that a "formal" hearing was required for parole revocation, an "informal" hearing was required for certain other matters, including "Status recommenda-

tions" and "Special Eligibility reviews," and no hearing was required for parole extension recommendations and special requests concerning individual leaves for inmates on leave status. The regulation did not define what was meant by "formal" and "informal" hearings or what the attributes of each might be.

Finally, for our purposes, Regulation PIR No. 240–6, designed to "establish a procedure for notifying inmates that they are to appear before the Board of Review," required the Executive Secretary to the Board to notify each eligible person scheduled for an annual review at least one week prior to the date of the hearing. A similar one-week notice was required for the special eligibility reviews, i.e., if the Board was to consider a recommendation that the inmate lose his eligibility status. That notice was also to contain "a specific statement of the reason for the recommendation made against him."

Notwithstanding the clear direction in the 1989 law that regulations complying with the APA be adopted, at the time of the ultimate hearing on January 16, 1992, no such regulations concerning eligibility review or the kind of hearing required with respect to such review had been adopted. Nearly three years after the enactment of that legislative mandate, Patuxent continued to operate under the 1985 regulations which themselves appear not to be in compliance with the law.[4]

By December, 1989, the new Board of Review had been appointed. On December 13, the Board held a leave review hearing with respect to Angell. This was presumably pur-

---

**4.** New regulations were proposed by the Department of Public Safety and Correctional Services in February, 1990. *See* Md.Reg. 17:4, Part II, Feb. 23, 1990, P–3 *et seq.* Based on comment received, those proposed regulations were withdrawn, amended, and proposed again in February, 1991. *See* Md.Reg. 18:4, Feb. 22, 1991, 484–93. Once again, however, due to "certain legal deficiencies," those regulations were withdrawn, amended, and resubmitted in November, 1991. *See* Md.Reg. 18:23, Nov. 15, 1991, 2566–77. These regulations were eventually adopted effective February 3, 1992. *See* Md.Reg. 19:2, Jan. 24, 1992, 155.

suant to the uncodified § 5 of the 1989 law. *See Holmes v. Robinson,* 84 Md.App. 144, 578 A.2d 294 (1990), *cert. denied,* 321 Md. 501, 583 A.2d 275 (1991). An attorney for Mr. Angell was permitted to attend the hearing, but he was not allowed to call any witnesses or question the Board members and was restricted to consulting with Angell and making a five-minute summation. In stark contrast to the prior Board's conclusion in April, 1988 that Angell was "no longer a danger to society," and despite the lack of any problem with the 15 day-leaves actually taken in 1988, the Board recommended against restoring his leave status. In its written report, the Board gave as its reasons the facts that (1) Angell was serving triple life sentences for three murders, (2) he had served but 13 years and eight months of those sentences, and, as such, "he has not been adequately deterred from future demonstrations of criminality," (3) his release "would depreciate the seriousness of his crimes and promote disrespect for the criminal justice system," (4) his continued incarceration would "substantially enhance his ability to lead a law abiding life when released at a later date," (5) he had not demonstrated "true emotional maturity and insight into his problems and appears to have made only superficial personality change," and (6) he had not been "adequately rehabilitated and continues to pose a threat to public safety." The Board, however, noted that its recommendation against the restoration of leave status should not be regarded as a conclusion that he was no longer eligible for participation in the leave program "or may not be restored to pre-release at some future date."

Worse news followed. On March 15, 1990, Secretary Robinson informed Angell that "after examination of the available relevant data and records regarding your status," none of which were described, he had concluded that Angell would pose a threat to public safety if returned to leave status and that such status would therefore not be restored. More importantly, Secretary Robinson stated that he was recommending that, at its next scheduled annual review, the

Board of Review determine "whether or not you should remain at the Institution as an eligible person."

Upon receipt of this letter, and believing that his removal from Patuxent was imminent, Angell, on April 9, 1990, attempted suicide.[5]   He was thereupon removed to the hospital wing at the nearby Maryland Correctional Institute at Jessup, where he underwent psychiatric evaluation and therapy for almost six months.   On October 1, 1990, having concluded that he was no longer a danger to himself, the prison psychiatrists allowed Angell to return to Patuxent.

Immediately upon his return, Angell was placed in administrative segregation.   During the next three days, Angell was examined at least three times by a Patuxent psychiatrist.   On the day of his return, notwithstanding the views of the psychiatrists at the Maryland Correctional Institute, the Patuxent psychiatrist concluded that Angell posed "a definitive risk of self injury" and that there was a high "index of probability for suicide attempt."   On October 3, after another examination, the unit psychiatrist determined that Angell had an "Adjustment Disorder" and a "Schizoid Personality Disorder" and that, after 14 years of imprisonment and no history of contraband beyond the bar of soap in 1976, he had a problem with alcohol dependence, cannabis abuse, and hallucinogen abuse.   That same day, he was given notice that the next day—October 4—he would be appearing before the Board for a determination of his eligibility status.   That one-day notice, of course, was in direct violation of Regulation PIR No. 240–6, requiring seven days' notice.   Angell's attorney was notified of the scheduled hearing on October 2; he was told, however, that he would not be permitted to attend.

---

**5.**   Indeed, on April 12, 1990, the Executive Secretary to the Board sent notice to Angell that he would be appearing before the Board on April 19, at which time the Board "will seriously consider rescinding your Eligible Person status and returning you to the authority of the Division of Correction."   That hearing or appearance was apparently cancelled in light of Angell's removal to the hospital.

On October 4, through his lawyer, Angell filed this action in the Circuit Court for Howard County seeking an order (1) enjoining the Director and Board of Review from holding the review hearing and from transferring him out of Patuxent, and (2) declaring that he had a right to be represented by counsel at all administrative hearings related to his status. The court promptly granted an *ex parte* injunction restraining the defendants from holding any hearing to reexamine Angell's status unless he was represented by counsel. That remained in effect until December 3, 1991 when, in a Memorandum and Order, the court concluded that Angell had no "right" to confinement at Patuxent, that reexamination of his eligibility status was not a contested case within the meaning of the APA, that there were no substantive limitations on the discretion of the Board to transfer him, and that "[c]onsequently, no right to counsel, private or appointed, exists at the eligibility or status review proceedings."

Angell's motions to amend and stay the enforcement of the judgment were denied on January 14, 1992. Two days later, the Board held a hearing of some sort, which counsel for Angell was not allowed to attend, and declared that Angell was no longer eligible to remain at Patuxent. That same day, but apparently after the hearing was held, Angell filed this appeal and sought from this Court an injunction staying the Board's order. By majority vote, a panel of this Court granted the stay.

At some point after Angell filed this action in October, 1990, he was transferred without benefit of any hearing to the hospital unit at the Maryland Penitentiary, supposedly because he needed medical treatment that could not be provided at Patuxent. The nature of this required treatment and the circumstances of the transfer are not disclosed in the record. In his motion for stay filed in this Court on January 16, 1992, we were informed that, as of then, Angell no longer needed to remain at the penitentiary for medical treatment but that Patuxent, having effectively transferred him there, refused to accept him back. Upon

the entry of our stay, however, Angell was returned to Patuxent and placed in the mental health unit, where he remains to this day.

We have laid out this long history in order to document the great reluctance with which we feel compelled to affirm the denial of the specific relief requested by Angell. For the reasons we shall immediately explain, while we believe that he has a liberty interest in remaining at Patuxent, we do not believe that he is entitled to counsel at a hearing held to reconsider his eligibility. It may be that the procedure employed by the Board of Review did not comport with due process in other respects, but that is not before us. Based on the complaint and the arguments made to the Circuit Court, we are concerned here only with the entitlement to counsel.

### Discussion

Angell claims an entitlement to counsel at eligibility review hearings on two specific grounds: one, that a liberty interest is at stake and counsel is therefore required by due process considerations; and two, that eligibility review hearings constitute contested cases under the APA and that Patuxent is barred from interfering with an attorney's right to represent his client at such hearings.[6]

### A. Due Process

The United States Supreme Court has dealt with the due process issue at hand in a number of cases, beginning with *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, *reh. denied*, 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155

---

**6.** Although, in his complaint, Angell asked that the defendants be enjoined from transferring him until he is accorded due process rights guaranteed by the APA "and by the Maryland and United States Constitution," his Constitutional due process argument has focused entirely on the Fourteenth Amendment, as construed by the United States Supreme Court. He has made no argument that the Maryland Constitution affords him any greater right than does the Fourteenth Amendment; nor does he claim any right to counsel under Maryland common law. We therefore do not address those issues.

(1976) and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) and continuing with *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); and *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The general teaching of those cases, taken from *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538, and quoted in *Olim,* 461 U.S. at 244–45, 103 S.Ct. at 1745, is that:

> "The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.
>
> Neither, in our view, does the Due Process Clause *in and of itself* protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."

(Emphasis in second paragraph added.) Indeed, in *Olim,* the Court found no liberty interest in confinement within a particular State, and thus the transfer of a prisoner from one State to another or between a State institution and a Federal one "does not deprive an inmate of any liberty interest protected by the Due Process Clause *in and of itself.*" (Emphasis added.) 461 U.S. at 248, 103 S.Ct. at 1747.

■ As each of these cases makes clear, however, while a transfer does not, of itself, implicate due process constraints, the State *may* create a liberty interest invoking those constraints if the decision to transfer is not an entire-

ly discretionary one, i.e., if the State places substantive limitations on the exercise of the decision-maker's discretion. *Hewitt v. Helms, supra,* 459 U.S. 460, 103 S.Ct. 864. But to have that effect those limitations must involve more than mere "procedural guidelines to channel the decision-making of prison officials" (*Hewitt,* at 471, 103 S.Ct. at 871); they must instead constitute "particularized standards or criteria [to] guide the State's decisionmakers." *Olim, supra,* 461 U.S. at 249, 103 S.Ct. at 1747, quoting from *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465–66, 69 L.Ed.2d 158 (1981). The distinction seems to be between procedural guidelines and substantive standards. Continuing to borrow from *Dumschat,* the *Olim* Court noted that "[i]f the decisionmaker is 'not required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' . . . the State has not created a constitutionally protected liberty interest."

■ Angell's argument, of course, is that there *were* "particularized standards" or "objective and defined criteria" governing his eligibility status. Apart from the procedural aspects of the 1985 regulations, calling for notice and an "informal" hearing, he points to the fact that, in order to transfer him out of Patuxent, the Board had to find that he was no longer an "eligible person," which meant that it had to determine that (1) he had less than three years remaining on his sentence, or (2) he no longer had an intellectual deficiency or emotional imbalance, or (3) he would be unlikely to respond favorably to Patuxent treatment, or (4) he could not be better rehabilitated at Patuxent than he could at a Division of Correction facility. These, he claims, are substantive criteria that limit the Board's discretion to have him transferred. The State, in response, views these elements as "purely subjective discretionary matters" imposing "no significant restraints on the exercise of discretion." We believe that Angell has the better argument.

In *Kentucky Dept. of Corrections v. Thompson, supra,* 490 U.S. 454, 109 S.Ct. 1904, the Court noted that, in determining whether constraints placed on decision-makers amount to "substantive limitations" sufficient to create a liberty interest, it had to "examine closely the language of the relevant statutes and regulations." *Id.* at 461, 109 S.Ct. at 1909. Although the Court acknowledged that the drafting and interpretation of regulations was not an exact science, it observed that a State may create "substantive limitations" on discretion in a number of ways, the most common of which was by establishing "substantive predicates" to govern official decision-making and then "mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* at 462, 109 S.Ct. at 1909. Implicit in the earlier decisions, it said, was the requirement that the regulations must "contain 'explicitly mandatory language,' *i.e.,* specific directives to the decision-maker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." Stated affirmatively, at 463, 109 S.Ct. at 1910: "In sum, the use of 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest."

The relevant regulations here are contained in the statute itself. As applied to Angell, the term "eligible person" is as defined in the 1977 law. *Cf. Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898 (1990). That embodies the four elements noted above which, the State's argument to the contrary notwithstanding, we view as substantive and specific standards. Section 11(b)(1) of art. 31B, under which the Board was required to act, and did act in this case, provides, in relevant part that:

"If the board of review concludes that the person is no longer an eligible person but should remain confined until released on parole in accordance with normal Parole Commission standards or expiration of his sentence ... the director *shall* notify the Commissioner [of Correction]

and send him a copy of the evaluation team's report. Within 90 days after that notice, the person *shall be delivered to the appropriate correctional facility designated by the Commissioner."*

(Emphasis added.)

This is "explicitly mandatory language." Under the statutory scheme, as supplemented by the questionable regulations followed by the Institution, the Board's function in an eligibility review is to determine (1) whether the inmate remains an eligible person as defined in the statute and, (2) if not, whether he needs continued incarceration. While the latter determination certainly involves discretion, to which are attached no specific substantive criteria, the former determination is just as clearly circumscribed by specific substantive criteria, and, thus, the ultimate decision of whether to transfer is not a matter of unfettered discretion or mere procedural guidelines. If the inmate is found still to be an eligible person, he may *not* be transferred; if he is found not to be an eligible person but in need of incarceration, he *must* be transferred. These constraints, we think, are more akin to those in *Hewitt, Greenholtz,* and *Board of Pardons, supra,* found to have created a liberty interest, than to those addressed in *Meachum v. Fano, Montanye v. Haymes, Olim v. Wakinekona,* and *Kentucky Dept. of Corrections, supra. See Lanier v. Fair,* 876 F.2d 243 (1st Cir.1989); *Brennan v. Cunningham,* 813 F.2d 1 (1st Cir. 1987).

Nor is the matter at issue here entirely one of where, or at what security level, Angell will serve out his sentence, as it is in most of the cases.[7] Apart from the special and enhanced therapeutic programs that are available only at Patuxent, inmates at Patuxent are not subject to the jurisdiction of the Parole Commission or of the classification

---

7. *See, for example, Rose v. Goldrick,* 130 A.D.2d 564, 515 N.Y.S.2d 505 (1987); *Wilson v. People,* 747 P.2d 638 (Colo.1987); *Asherman v. Meachum,* 213 Conn. 38, 566 A.2d 663 (1989); *Mitchell v. Meachum,* 770 P.2d 887 (Okla.1988); *White v. Fauver,* 219 N.J.Super. 170, 530 A.2d 37 (1987).

officials of the Division of Correction.   Although their parole now must be approved by the Secretary of Public Safety and Correctional Services and, if they are under a life sentence, by the Governor as well, it is the Board of Review, not the Parole Commission, that initially determines that matter, as well as their work release and leave status.   Until 1989 at least, that was intended by the General Assembly and was widely regarded by inmates such as Angell, carrying long sentences, as an advantage. Angell apparently feels it still is an advantage.

■   Our conclusion that Angell enjoys a liberty interest in remaining at Patuxent does not end the discussion.   It means that the decision to transfer him must comport with due process, but, as noted in *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), that just begs the question of what process is due.   In this regard, we are not concerned with those legions of cases arising out of prison settings where the court has found no liberty interest to exist in the first instance.   Rather, we need to focus on those cases where such an interest *has* been found to exist and to consider whether, in that circumstance, the assistance of counsel is a Constitutional mandate.

The United States Supreme Court seems to have taken a flexible approach to the requirement of counsel in prison-setting proceedings at which liberty interests are at stake. In *Gagnon v. Scarpelli*, 411 U.S. 778, 787–88, 93 S.Ct. 1756, 1762–63, 36 L.Ed.2d 656 (1973), dealing with probation revocation proceedings, the Court observed:

"The introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding.   If counsel is provided for the probationer or parolee, the State in turn will normally provide its own counsel; lawyers, by training and disposition, are advocates and bound by professional duty to present all available evidence and arguments in support of their clients' positions and to contest with vigor all adverse evidence and views.   The role of the hearing body itself, aptly described in *Morrissey [v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d

484 (1972) ] as being 'predictive and discretionary' as well as factfinding, may become more akin to that of a judge at a trial, and less attuned to the rehabilitative needs of the individual probationer or parolee. In the greater self-consciousness of its quasi-judicial role, the hearing body may be less tolerant of marginal deviant behavior and feel more pressure to reincarcerate than to continue nonpunitive rehabilitation. Certainly, the decisionmaking process will be prolonged, and the financial cost to the State—for appointed counsel, counsel for the State, a longer record, and the possibility of judicial review—will not be insubstantial."

These comments in *Gagnon* dealt only with the question of whether counsel had to be appointed for indigent persons, not whether privately retained lawyers could be barred. In that context also the Court added that the decision as to the need for counsel had to be made "on a case-by-case basis in the exercise of a sound discretion by the state authority" and that, while the presence of counsel "will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees." *Id.*, 411 U.S. at 790, 93 S.Ct. at 1763–64. The only clue as to how that discretion should be exercised came in language at 786–87, 93 S.Ct. at 1761–62, where the Court noted that an unskilled or uneducated prisoner may have difficulty in presenting his version of disputed sets of facts "where the presentation requires the examining or cross-examining of witnesses or the offering or dissecting of complex documentary evidence."

In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court considered the scope of due process requirements applicable to a prison disciplinary proceeding where, by virtue of State law, a prisoner could lose good time credits only upon a finding of "serious misconduct." After reviewing the nature of those kinds of

proceedings in light of what it had said in *Gagnon* and *Morrissey,* the Court concluded, 418 U.S. at 570, 94 S.Ct. at 2981–82:

> "The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right *to either retained or appointed* counsel in disciplinary proceedings."

(Emphasis added.) The Court quickly added that, where the inmate is illiterate or "the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case," he should be allowed the assistance of a fellow inmate or help from the prison staff. The determination that due process does not require the assistance of counsel at prison disciplinary proceedings, even those in which a liberty interest is involved, was confirmed almost summarily in *Baxter v. Palmigiano,* 425 U.S. 308, 314–15, 96 S.Ct. 1551, 1556, 47 L.Ed.2d 810 (1976).

The closest that the Supreme Court has come to articulating a general criterion for when counsel may be required in a case such as this was in *Vitek v. Jones, supra,* 445 U.S. at 498, 100 S.Ct. at 1266, where, in a Concurring Opinion, Justice Powell recounted the holding in *Gagnon* as follows:

> "We noted that probationers would not always need counsel because in most hearings the essential facts are undisputed. In lieu of a *per se* rule we held that the necessity of providing counsel should be determined on a case-by-case basis. In particular, we stressed that factors governing the decision to provide counsel include (i) the existence of factual disputes or issues which are 'complex or otherwise difficult to develop or present,' and

(ii) 'whether the probationer appears to be capable of speaking effectively for himself.' "

A transfer from Patuxent to the general prison population is not, of course, quite the same thing as a probation revocation or a prison disciplinary proceeding; depending on the nature of the disciplinary proceeding, it may be more or less onerous to the inmate. In *Wolff,* for example, the inmate's actual release date was prolonged by the loss of good time credits. We think, however, that the concepts enunciated by the Supreme Court in *Gagnon* and *Wolff* are equally applicable to an eligibility review proceeding. It is not intended to be an adversary proceeding. On the record before us, which deals only with Angell, there is no indication that the factual and legal issues are particularly complex, that there is any special need for the detailed examination or cross-examination of witnesses, or that Angell, in particular, is either illiterate or otherwise unable to make an effective presentation. As in parole eligibility determinations, the Board apparently considers the reports and recommendations of the treatment staff and any response that the inmate wishes to make. The real issue is essentially a judgmental one based on the statutory criteria. The inmate is entitled to a week's advance notice and to consult with counsel, if he has counsel, in order to prepare for the "informal" hearing. On the record before us we believe that, in Angell's case, that sufficed.

## B. Contested Case

In an alternative argument, Angell claims that he is entitled to the assistance of counsel at his eligibility review hearing because that hearing constitutes a "contested case" within the meaning of the APA.

The part of the Maryland APA that concerns us here is codified in title 10, subtitle 2 of the State Government article. Section 10–201(c) defines the term "contested case," in relevant part, as "a proceeding before an agency to determine ... a right, duty, statutory entitlement, or privilege of a person that is required by law to be deter-

mined only after an opportunity for an agency hearing." Sections 10–204 through 10–217 then specify certain rights or procedural requirements applicable to contested cases. Before considering those sections, however, we first need to determine whether an eligibility proceeding before the Board of Review constitutes a contested case, for if it does not, the rights and requirements spelled out in the ensuing sections do not apply.

Relying on *Sugarloaf v. Waste Disposal*, 323 Md. 641, 594 A.2d 1115 (1991) and *Holmes v. Robinson, supra*, 84 Md.App. 144, 578 A.2d 294, the State urges that the proceeding is *not* a contested case because it is not an "adversarial trial type proceeding contemplated by the 'contested case' provisions of the APA," a conclusion "buttressed by Patuxent Institution Regulation 240–5V.B.1, which establishes an 'informal hearing' as the appropriate mechanism for conducting an annual review." We agree with the State, although not because of the cited regulation.

In *Sugarloaf,* the Court pointed out that the APA itself does not grant a right to a hearing; that right "must come from another source such as a statute, a regulation, or due process principles." 323 Md. at 652, 594 A.2d 1115. "Moreover," the Court continued at 653, 594 A.2d 1115, "the statute or regulation [or due process principle] which grants the right to a hearing may negate the fact that the hearing is to be a 'contested case' or 'adjudicatory' hearing. If the statutory or regulatory [or Constitutional] scheme does so, then the 'contested case' provisions of the APA are inapplicable." [8]

At issue in *Sugarloaf* was whether the first phase of a three-phase waste-disposal permit process—a "public hearing" on the application—constituted a contested case. Af-

---

**8.** We have added the bracketed language, which does not appear in the *Sugarloaf* Opinion, because we believe it is necessarily implied from the long-established principle, noted in the quoted language from page 652, 594 A.2d 1115, that the right to a hearing may be Constitutional in origin.

ter looking at the regulations governing both the first phase public hearing and the process as a whole, the Court determined that the first phase proceeding was "merely a preliminary or interlocutory requirement, prior to obtaining permission to actually construct and operate a potential source of pollution," *id.* at 653, 594 A.2d 1115, and that "the construction permit stage is a more appropriate time for a contested case hearing than the [preliminary] approval stage." *Id.* at 657, 594 A.2d 1115.

In its ensuing Opinion on Reconsideration, 323 Md. at 659–74, 594 A.2d 1115, the Court made clear that whether a proceeding constitutes a contested case does not depend on whether the required hearing is public or private or whether the proceeding is best described as legislative rather than adjudicative or informational rather than decisional in nature. The "bent" seems to be that, if a collateral source requires a hearing before the agency can determine a person's right, duty, statutory entitlement, or privilege, the proceeding will be regarded as a contested case unless the source granting the right of hearing negates the fact that the hearing is to be a "contested case" hearing. *Id.* at 653, 594 A.2d 1115. As did the *Sugarloaf* Court, we must look to that collateral source.

Here, as we have indicated, the right to a hearing emanates from two sources—the Constitutional right to due process and the "regulation" calling for an "informal" hearing.

As to the regulation, the very validity of which is questionable, it provides, as we said, for an "informal" hearing, in contrast to the "formal" hearing required for parole revocations. Neither kind of hearing is defined in the regulation, and so not much can be made of this beyond the obvious inference that something less than a "formal" hearing was anticipated.[9] As actually interpreted and im-

---

9. As we indicated, apart from statute (see former Md.Code art. 41, § 117 (1971 Repl.Vol.), current Md.Code art. 41, § 4–511), due process requires a hearing before one's parole may be revoked. The mini-

■■■■■■■■■■

plemented by Patuxent, it would seem that the regulation does negate the notion of the kind of adversarial, trial-type proceeding that generally characterizes a contested case.

That is clearly the case with respect to the due process source. In *Wolff v. McDonnell, supra,* 418 U.S. at 561–63, 94 S.Ct. at 2977–78, the Court made clear that an inmate facing disciplinary proceedings was not entitled to as formal or structured a hearing as required under *Morrissey* in parole revocation proceedings. Rather, it held that (1) although an inmate facing disciplinary sanctions "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals," prison officials "must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence" (*id.* at 566, 94 S.Ct. at 2980); (2) "confrontation and cross-examination of those furnishing evidence against the inmate" were not Constitutionally required (*id.*

mum due process requirements, as set forth in *Morrissey v. Brewer, supra,* 408 U.S. at 489, 92 S.Ct. at 2604, include:

"(a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial."

It is evident that the General Assembly regarded even that kind of hearing as potentially falling within the definition of a contested case, for it acted expressly to exempt the Parole Commission from the contested case provisions of the APA. *See* State Gov't art., § 10–202(a)(3)(vi).

at 567–69, 94 S.Ct. at 2980–81); and (3) as noted earlier, the presence of counsel is not required.

These limitations are at odds with the rights conferred in a contested case. State Gov't art., § 10–208(e), provides, in relevant part, that, "[o]n a genuine issue in a contested case, each party is *entitled* to: (1) call witnesses; (2) offer evidence, including rebuttal evidence; [and] (3) cross-examine any witness that another party or the agency calls . . . ." (Emphasis added.) By expressly limiting these rights, the Supreme Court has rather strongly suggested, if not by implication actually held, that the hearing required by due process is *not* the kind that makes the proceeding a contested case under the APA. It has, in other words, "negate[d] the fact that the hearing is to be a 'contested case' or 'adjudicatory' hearing."

For these reasons, we conclude that an eligibility review proceeding is not a contested case under the Maryland APA. We therefore do not need to consider whether, if it were such a case, the assistance of counsel would be required.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.