Dear Marshall H. Feldman
You have asked for our opinion concerning a provision of the Maryland Workers' Compensation Act that requires suspension of an employer's business license when the employer fails to make required payments to the Uninsured Employers' Fund. Specifically, you ask whether that provision applies to a dry cleaners license — a license issued by a circuit court clerk under Title 17 of the Business Regulation Article and designed primarily to raise revenue, rather than to regulate business conduct. In addition, you ask what agency would have authority to suspend such a license and what process should be followed.
In our opinion, an employer's failure to make required payments to the Uninsured Employers' Fund may result in the suspension of the employer's business license, regardless of whether the particular license serves primarily as a revenue-raising measure or is part of a regulatory scheme. A dry cleaners license issued under Title 17 of the Business Regulation Article is subject to suspension by the Comptroller. Prior to suspending a license, the Comptroller should provide the licensee with notice of the proposed suspension, and an opportunity to be heard limited to the question whether the debt has been paid.
 I Workers' Compensation Law
A. Employer Obligation to Provide Coverage
The Maryland Workers' Compensation Act ("Act"), Annotated Code of Maryland, Labor Employment Article ("LE"), § 9-101 et seq., is designed to ensure that employees in the State receive compensation for work-related injuries. R. P. Gilbert and R. L. Humphreys, Jr., Maryland Workers' Compensation Handbook § 2.1 (2d ed. 1993). The Act requires an employer to provide its employees[1] with workers' compensation coverage through one of several vehicles — an authorized commercial insurance carrier, the Injured Workers' Insurance Fund, a qualifying self-insurance group, or a self-insurance plan acceptable to the Workers' Compensation Commission ("Commission"). LE § 9-402(a). The employer, in turn, is assured that it will not be otherwise liable to the employee with respect to a job-related injury. LE § 9-509.[2] Should an employer fail to secure the coverage required by the Act, the employer is subject to criminal prosecution. LE §§ 9-1107(b), 9-1108(a). In addition, the employer is exposed to tort liability to an injured employee. LE § 9-509(c). Underlying this scheme is a safety net known as the Uninsured Employers' Fund.
B. Uninsured Employers' Fund
The Uninsured Employers' Fund ("Fund") was established by the Legislature in 1967. See Chapter 152, Laws of Maryland 1967. It serves, in effect, as a workers' compensation insurer of last resort. See LE § 9-1001 et seq.; LE § 10-301 et seq.; see also Gilbert 
Humphreys, supra, §§ 2.2-4 and 14.3. Its purpose is to "protect injured workers whose employers failed, either willfully or negligently, to carry workers' compensation insurance. . . ." Uninsured Employers' Fund v. Lutter, 342 Md. 334, 345, 676 A.2d 51 (1996). If an employer fails to pay an award or to object to the award in a timely manner, the injured employee may apply for payment from the Fund.[3] LE § 9-1002.
The Fund is financed through various assessments against employers and insurers, including an assessment imposed on an uninsured employer whenever the Commission issues a decision on a compensation claim against the employer.[4] An uninsured employer may also become liable to the Fund for any payments made by the Fund with respect to an award against that employer. If the Fund has made payments to an employee, it is subrogated to the rights of the employee against the uninsured employer.[5]
LE § 9-1003(a). The Fund may institute a civil action against the uninsured employer to recover the amount paid by the Fund, and it may also refer the matter for criminal prosecution. LE § 9-1003(b).
C. License Suspension
In addition to civil and criminal sanctions, the Act provides an administrative sanction for an employer that fails to pay an assessment to the Fund or to reimburse the Fund for an award paid on the employer's behalf. In particular, LE § 9-1012 authorizes suspension of any business license issued to the employer, by the State or by a local government, for an activity requiring workers' compensation coverage. Whenever an employer is in default[6] of its obligations under the Act, the Commission is to warn the employer that "the license or permit of the employer to do business in the State may be suspended." LE § 9-1002(c).
The Act briefly sets forth the process to be followed by the Fund and by the licensing agency to effect a suspension. The Fund is to notify the employer by certified mail that the employer's business license may be suspended if the employer fails to pay the assessment or reimbursement owed to the Fund. LE § 9-1012(a)(1). A copy of that notice is sent to each State, county, or municipal unit that has issued a "license or permit to the employer for an activity for which workers' compensation coverage is required by law." LE § 9-1012(a)(2).
Within 15 days after receiving the notice, the licensing unit is to provide the employer with notice and an opportunity for a hearing "as otherwise may be required by law." LE § 9-1012(b). "If [the] law requires . . . a hearing," written notice of the hearing date is to be provided to the Director of the Uninsured Employers' Fund Board. Id. If the licensing unit finds that the employer failed to pay an assessment or to reimburse the Fund for payment of an award, the licensing unit is to suspend the license or permit until payment is made or until the employer and the Fund reach an agreement concerning payment. LE § 9-1012(c).
 II Miscellaneous State Business Licenses
A. Revenue Licenses
A government-required license may be characterized as either a regulatory license or a revenue license. Generally, a regulatory licensing scheme requires compliance with conditions prescribed under the State's police power, in addition to payment of a fee, as a condition of the license. While a revenue license may also entail some level of regulation, its primary purpose is to raise revenue. Payment of the license fee generally confers a right to carry on the business without further conditions. Maryland Theatrical Corporation v. Brennan,180 Md. 377, 381-82, 24 A.2d 911 (1942); see also Ocean City v. Purnell-Jarvis, 86 Md. App. 390, 405-6, 586 A.2d 816 (1991).
Title 17 of the Business Regulation Article includes a number of licensing provisions, most of which were previously codified in former Article 56. Many of those licenses have been recognized as revenue measures, rather than regulatory licenses. Brown v. State, 177 Md. 321,328, 9 A.2d 209 (1939), citing Banks v. McCosker, 82 Md. 518, 522-23
(1896) (hawkers and peddlers license a revenue measure); State v. Shapiro, 131 Md. 168, 173, 101 A. 703 (1917) (junk dealers license plainly a revenue measure); see also 68 Opinions of the Attorney General 96, 102 (1983) (identifying business licenses under former Article 56 as revenue-raising measures).
B. Dry Cleaners License
Among the provisions in Title 17 of the Business Regulation Article is a licensing scheme applicable to dry cleaners that has been in place for 85 years. See Chapter 707, Laws of Maryland 1916, amending former Article 56, now codified at BR § 17-1101 et seq. The statute requires that a person obtain a license as a prerequisite to operating a business "of cleaning, dyeing, pressing, or laundering, other than hand laundering, in the State." BR § 17-1102. Like most other licenses under Title 17, a license to operate a dry cleaning business is issued by the clerk of the local circuit court. BR §§ 17-304, 17-1101.
There are few prerequisites for obtaining a dry cleaners license. The applicant is to submit the appropriate application form to the clerk of the circuit court along with certifications relating to the payment of taxes. BR § 17-302(a). The applicant must also submit proof of workers' compensation coverage for any employees covered by the Act. BR § 1-205. Finally, the applicant must also pay a fee based on the number of individuals employed by the business. BR § 17-1103. The statute does not provide for any ongoing regulatory oversight. Thus, the license to operate a dry cleaning business, like most other business licenses issued under Title 17 of the Business Regulation Article, is appropriately categorized as a revenue license.[7]
 III Analysis
You ask whether the business license suspension provisions of the Act apply to a dry cleaners license and, if so, what process would govern such a suspension. To answer your inquiry, we must determine: (1) whether the authority in LE § 9-1012 extends to a license that is primarily a revenue-raising measure, particularly when the licensing statute itself does not otherwise contemplate suspension of the license; (2) if LE § 9-1012 applies, what agency is the "licensing unit" authorized to initiate a suspension; and (3) what process should be accorded the business in connection with the suspension.
A. Application of Suspension Sanction to Revenue Licenses
The broad language of LE § 9-1012 makes no distinction between regulatory licenses and licenses that are primarily revenue measures. Rather it refers to "a license or permit . . . for an activity for which workers' compensation coverage is required by law." LE § 9-1012(a)(2). Notably, a condition for issuance of a revenue license under Title 17 is proof of workers' compensation coverage. BR § 1-205. Thus, it appears that revenue licenses under Title 17, including a dry cleaners license, fit squarely within the purview of LE § 9-1012.
The legislative history of these provisions is also instructive. In 1975, in an effort to encourage compliance with the Workers' Compensation Act, the Legislature amended provisions in 20 articles of the Annotated Code of Maryland to require applicants for various licenses and permits to provide evidence of workers' compensation coverage. That requirement encompassed both regulatory and revenue licenses, including licenses and permits issued under former Article 56 of the Code such as a dry cleaners license.[8] Chapter 657, § 11, Laws of Maryland 1975, enacting former Article 56, § 2C, now codified as BR § 1-205; see also LE § 9-105. An applicant for a license or permit could provide proof of workers' compensation coverage by submitting a certificate of compliance issued by the Commission or the number of the applicant's workers' compensation insurance binder or policy.[9] The 1975 legislation, however, did not address the consequences if the licensee were to discontinue workers' compensation coverage.
Ten years later, the Legislature again looked to business licensing as leverage in dealing with the problem of uninsured employers. Chapter 614, Laws of Maryland 1985, now codified as LE § 9-1012. However, unlike the 1975 enactment, on this occasion the Legislature did not attempt to identify every applicable licensing scheme. Rather, it simply provided for the suspension of a "license [of an employer] to do business in the State" if the employer failed to pay an assessment or reimbursement owed to the Fund. The legislative history of the 1985 legislation confirms that it was intended as an incentive for employers to pay moneys owed to the Fund. See 75 Opinions of the Attorney General 472, 475 (1990).
In construing a statutory provision, results that are unreasonable, illogical, or inconsistent with common sense should be avoided. Kaczorowski v. City of Baltimore, 309 Md. 505, 516, 525 A.2d 628 (1987). It would be illogical to require proof of workers' compensation insurance as a condition of the issuance of a dry cleaners license, but to exempt that license from the suspension process if the licensee dropped or failed to renew coverage. Otherwise, an employer might obtain coverage for only the brief time period when the requisite license was to be issued or renewed — a practice that would undermine the Legislature's intention to use business licensing as leverage in an effort to attain nearly universal workers' compensation coverage.
Thus, in our opinion, a dry cleaners license under Title 17 of the Business Regulation Article may be suspended under LE § 9-1012 if the licensee fails to pay an assessment or reimbursement owed to the Fund.
B. Authority to Suspend License
The Act directs the "licensing unit" to effect suspension of a license for failure to make required payments to the Fund. Title 17 of the Business Regulation Article divides responsibilities relating to dry cleaners licenses, and most other business licenses, between the clerk of the local circuit court and the Comptroller. Which is the "licensing unit" charged with implementing a suspension under LE § 9-1012?
As noted above, the clerk of the circuit court issues most business licenses under Title 17, including a dry cleaners license. The clerk ensures that an applicant provides required information and that fees are paid, and in turn delivers the appropriate license. BR §§ 17-302,17-304.[10] The clerk is also responsible for the appropriate distribution of license fees and for reporting certain information to the Comptroller and the Department of Assessments and Taxation in connection with licenses issued. BR §§ 17-204 through 17-206.
The Comptroller is assigned several functions under Title 17. The Comptroller provides license application forms to the clerks' offices and serves as a central repository of basic information relating to such licenses issued throughout the State. See BR § 17-203 (blank licenses); BR § 17-204 (clerks of the circuit courts to report certain licensing information to the Comptroller twice each year).
More importantly, the Comptroller is specifically charged with enforcing the licensing statutes in Title 17. BR § 17-202(a).[11]
For that purpose, the Comptroller is to appoint license inspectors, undertake investigations, hold hearings, administer oaths, examine witnesses, receive evidence, and issue subpoenas for the attendance of witnesses and the production of evidence. BR § 17-202(b), (d). In addition, the Comptroller is authorized to adopt regulations to carry out the licensing provisions. BR § 17-202(e). Finally, the Comptroller may also initiate proceedings for criminal prosecutions of persons who fail to obtain a license or pay the required fee. BR § 17-2104. However, unlike the Comptroller's express authority under other licensing schemes outside Title 17,[12] suspension of a license is not specifically mentioned in Title 17.[13]
Nevertheless, the Legislature has elected to make compliance with certain provisions of the workers' compensation law one of the few conditions of licenses authorized under Title 17 of the Business Regulation Article. Although these licenses are issued by the clerk of the local circuit court, the clerk's responsibilities are largely ministerial. See, e.g., 75 Opinions of the Attorney General 62 (1990) (discussing alternative meanings of the term "issue" under licensing schemes). It is the Comptroller who is charged with "enforcement" of these licensing statutes. Suspension of a license for the failure to maintain required workers' compensation coverage or to pay required assessments is part of the enforcement of these licensing schemes vested in the Comptroller. Moreover, under this scheme, the Legislature has equipped the Comptroller, rather than the clerk, with personnel, powers, and regulatory mechanisms that may be employed to effect a suspension.
In our view, the Comptroller's Office is the agency responsible for suspension under LE § 9-1012 of a license issued under Title 17 of the Business Regulation Article for an activity requiring workers' compensation coverage. In other words, the Comptroller is the "licensing unit" for purposes of suspending a dry cleaners license under LE § 9-1012.
C. Suspension Process
The Act requires that the Commission, and later the Fund, notify a delinquent employer that its business license is subject to suspension for nonpayment of its obligations to the Fund. LE §§ 9-1002(c)(2),9-1012(a). The Fund is also to send a copy of its notice to any State or local licensing unit. LE § 9-1012(a)(2). Within 15 days after receipt of a copy of the Fund's notice, the licensing unit is to proceed with "the notice and opportunity for a hearing as otherwise may be required by law." LE § 9-1012(b). If the licensing unit is required to hold a hearing by law, it must notify the Fund in writing of the date of the hearing. LE § 9-1012(b)(2). The statute thus defers to other applicable law as to whether a hearing is required and the nature of any such hearing.
As noted above, Title 17 of the Business Regulation Article does not address the suspension of revenue licenses, much less the procedural aspects of a suspension. Due process principles embodied in theFourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights[14] require the State to accord procedural due process in connection with the deprivation of a property interest. An employer that holds a license prerequisite to the operation of its business has a property interest in that license. See, e.g. Barry v. Barclai, 443 U.S. 55, 64 En. 11 (1979) (horse trainer's license); Regan v. Board of Chiropractic Examiners, 120 Md. App. 494, 510,707 A.2d 891 (1998) (chiropractor license); Lindsay v. City of Philadelphia, 863 F. Supp. 220, 223 (E.D.Pa. 1994) (street vendor license). Therefore, the employer must be accorded procedural due process in connection with a suspension of that license. However, rather than dictating a particular procedure, due process requires only such procedural protections as the situation requires. See, e.g., Vavasori v. Commission on Human Relations, 65 Md. App. 237, 245, 500 A.2d 307
(1985).
The State Administrative Procedure Act ("APA") sets forth detailed procedures for "contested case" hearings in certain circumstances, including when constitutional due process principles require an agency hearing.[15] Annotated Code of Maryland, State Government Article ("SG"), § 10-202(d)(1)(i). (defining contested case hearing, in part, as a "proceeding before an agency to determine . . . a right, duty, statutory entitlement, or privilege of a person that is required by . . . constitution to be determined only after an opportunity for an agency hearing. . .").[16] However, due process principles granting a right to a hearing "may negate the fact that the hearing is to be a `contested case.'" Angell v. Henneberry, 92 Md. App. 279, 300, 607 A.2d 590 (1992). The level of process required is determined by balancing the private and government interests at stake. Vavasori, 65 Md. App at 246, citing Mathews v. Eldridge, 424 U.S. 319, 334 (1976).
Must the Comptroller provide the holder of a dry cleaners license, whose license is subject to suspension for nonpayment of an assessment by the Commission, a contested case hearing under the APA? While the licensee has an important interest at stake, two factors suggest that the Comptroller is not required to provide a contested case hearing.
First, a suspension under LE § 9-1012 would occur only after the licensee had been notified by both the Commission and the Fund of potential loss of the license. LE §§ 9-1002(c)(2) and 9-1012(a). The employer would have had ample opportunity before the Commission to contest an award or to challenge an assessment payable to the Fund. See, e.g., Uninsured Employers' Fund v. Hoy, 23 Md. App. 1, 8, 325 A.2d 446
(1974) (employer has opportunity before Commission to show it is not an uninsured employer and therefore not liable for assessment). An employer that disagreed with the Commission's decision would be entitled to judicial review of that decision. LE § 9-737.
Also significant is the limited nature of the factual predicate for suspension under LE § 9-1012. The only factual issue before the Comptroller would be whether "the employer has failed to . . . reimburse the Fund for payment of an award . . . or pay an assessment under [Title 9, Subtitle 10 of the Labor and Employment Article]." LE § 9-1012(1). The statute does not authorize the licensing unit to inquire into the merits of the underlying award or assessment. There thus appears to be little need for a full scale evidentiary hearing to contest whether there is an outstanding assessment or award against the employer. Nor is that issue likely to involve credibility disputes that are best addressed through face-to-face adversarial proceedings.
Given the employer's opportunity to contest the underlying liability before the Commission and the limited issue to be determined by the Comptroller, we conclude that due process principles would not require a contested case proceeding under the APA as a prerequisite to suspension of a dry cleaners license under LE § 9-1012. See, e.g., Maryland Racing Commission v. Castrenze, 335 Md. 284, 298, 643 A.2d 412 (1994) (Racing Commission need not offer presuspension hearing under former SG § 10-405[17] when its action was based on suspension in another state); cf. Lujan v. G G Fire Sprinklers, Inc., 121 S.Ct. 1446 (2001) (statute that permitted state, without notice or hearing, to withhold money from subcontractor satisfied due process because subcontractor had right to bring claim to recover withheld payments). In our view, due process is satisfied if the Comptroller provides the licensee with written notice of the proposed suspension and an opportunity to be heard on the question whether the debt remains unpaid.[18]
We recommend that the Comptroller exercise his rule-making authority under Title 17 of the Business Regulation Article to adopt regulations governing the suspension of such licenses pursuant to LE § 9-1012.
 IV Conclusion
In our opinion, a business license issued under Title 17 of the Business Regulation Article primarily as a revenue measure is subject to suspension under the Workers' Compensation Law if the business fails to make required payments to the Fund. The Comptroller is the "licensing unit" for purposes of LE § 9-1012 to effect suspension of such a license. Although a contested case hearing is not required, the licensee should be given notice and an opportunity to be heard as to whether the debt remains unpaid. It would be advisable for the Comptroller to adopt regulations governing the suspension of these licenses under LE § 9-1012.
 J. Joseph Curran, Jr. Attorney General
 William R. Varga Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
[1] The Act contains detailed provisions setting forth those employees for whom coverage must be provided. See LE § 9-201 et seq.; see also LE § 9-101(f) (definition of "covered employee"). The benefits of coverage, as well as the concomitant limitations on other remedies, also apply to eligible dependents in cases where a work-related injury or occupational disease results in the death of the employee. See LE § 9-509.
[2] This protection does not apply, however, if the employer intentionally harms the employee. LE § 9-509(d).
[3] The Fund may promptly pay the award or seek further review by the Commission. LE § 9-1002(f), (g). The employee's dependents may also make a claim against the Fund. LE § 9-1002(e).
[4] The assessment against an uninsured employer ranges from $150 to $500, plus 15% of the amount of the award made on the claim, subject to a $2,500 per claim limit on the percentage portion of the assessment. LE § 9-1005.
Other assessments may also be made against insured employers and insurers. An employer, or the employer's insurer, is assessed one percent of any award for death or permanent disability, including any award for disfigurement or mutilation, as well as one percent of each settlement agreement approved by the Commission. LE § 9-1007(a). If the Fund's reserves are inadequate to meet anticipated losses, this assessment may be doubled. LE § 9-1007(b). Other assessments payable to the Fund include a $300 assessment against an insurer, under certain circumstances, based on the insurer's failure to certify insurance, LE § 9-1006, and an assessment payable when an award is not paid due to the unavailability of a covered employee or eligible dependent. LE § 9-1008(b) and (c).
The payment of assessments is suspended if the Fund reaches a $5 million balance, but resumes if the Fund balance falls below specified statutory thresholds. LE § 9-1011. Criminal penalties collected under LE § 9-1108 are also credited to the Fund. LE § 9-1108(c).
[5] The Fund is also subrogated to the rights of the uninsured employer and may seek recovery from a third party tortfeasor. LE § 9-1004. See also LE § 9-902.
[6] The Act sets forth the circumstances of default by an employer as follows:
 Unless an application for review has been timely filed under [§ 9-1002(g)] or a notice of appeal timely served, an employer is in default on a claim by a covered employee or the dependents of a covered employee if the employer fails to:
 (1) secure payment of compensation in accordance with § 9-402 of [the Workers' Compensation Act];
 (2) except for a government self-insurance group authorized by § 9-404 . . ., deposit security in accordance with § 9-405 . . . that is:
 (i) sufficient to cover a claim by a covered employee; and
(ii) at least $100,000; and
 (3) pay compensation in accordance with an award within 30 days after the date of the award.
LE § 9-1002(b). After the Commission notifies the employer that the employer is in default on a claim, the employer is required to pay the award. Within 30 days after receiving the notice, however, the employer may notify the Commission of reasons why the employer objects to the award — a response that serves as an application for review. LE § 9-1002(c) — (d).
[7] Operating a dry cleaning business without the required license constitutes a criminal offense. See BR §§ 17-2103 through17-2106.
[8] At the time the 1975 legislation was being considered, the State Licensing Bureau of the Comptroller's Office opposed the legislation to the extent that it affected business licenses under former Article 56 "administered and enforced by the State License Bureau but issued by the various clerks of the circuit courts and the Clerk of the Court of Common Pleas in Baltimore City." Letter from Thomas P. Danaher, Chief Licensing Inspector, to the Honorable Charles J. Krysiak, Chairman, Constitutional and Administrative Law Committee, February 3, 1975. Legislative History File, House Bill 181 (1975). However, the Legislature did not provide an exception for those licenses.
[9] The Commission is to supply agencies that issue licenses or permits with application forms that employers may use to obtain a certificate of compliance from the Commission. If the Commission rejects the employer's request for a certificate, the employer may either reapply or seek judicial review under the Administrative Procedure Act. See LE § 9-105.
[10] BR § 17-302 provides that "[e]ach application . . . shall be verified in the way . . . that the Comptroller requires by regulation." However, the Comptroller has not adopted regulations concerning business licenses issued under Title 17 of the Business Regulation Article.
[11] When the proposed Business Regulation Article was introduced in the Legislature, this provision read: "[t]he Comptroller shall supervise the administration of [Title 17], including the issuance the licenses by the clerks." See Chapter 4, § 2, Laws of Maryland 1992. The current language, "[t]he Comptroller shall enforce this title," resulted from an amendment to accompanying corrective legislation. Chapter 26, Laws of Maryland 1992. Although the legislative history file does not explain the change, presumably it was felt that the alternative language better summarized the broad enforcement authority of the Comptroller under former Article 56, § 11(b). (1988 Repl. Vol.).
[12] See, e.g., BR §§ 16-210 and 16-306 (authorizing the Comptroller to suspend or revoke licenses issued by clerks of the circuit courts for the retail sale of cigarettes).
[13] The sole exception under Title 17 of the Business Regulation Article is the licensing provisions applicable to transient vendors. These licenses are issued by the Comptroller, and the Comptroller has authority to issue a stop sale order and to suspend or revoke the license in specified circumstances. See BR § 17-20A-01 et. seq.
[14] The Fourteenth Amendment and Article 24 of the Declaration of Rights have long been construed in concert. Samuels v. Tschechtelin,135 Md. App. 483, 523, 763 A.2d 209 (2000).
[15] The APA "itself does not grant a right to a hearing. That right must come from another source such as a statute, a regulation, or due process principles." Sugarloaf Citizens Association v. Northeast Maryland Waste Disposal Authority, 323 Md. 641, 652, 594 A.2d 1115 (1991). Annotated Code of Maryland, State Government Article, § 10-202(d).
[16] The APA defines "contested case" as:
(1) . . . a proceeding before an agency to determine:
 (i) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing; or
 (ii) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing.
 (2) "Contested case" does not include a proceeding before an agency involving an agency hearing required only by regulation unless the regulation expressly, or by clear implication, requires the hearing to be held in accordance with this subtitle.
The APA has special procedures for the suspension or revocation of a license. SG § 10-226. However, the definition of "license" under the APA excludes a license "required only for revenue purposes." SG §§ 10-202(f), 10-226(a)(2)(ii). Because, as we have concluded, a dry cleaners license is a revenue license, SG §§ 10-202(d)(1)(ii) and 10-226 do not apply and our analysis focuses on the application of SG § 10-202(d)(1)(i).
[17] Former SG § 10-405, which provided a right to a hearing in connection with a license suspension or revocation, has been incorporated without substantive change into the contested case provisions of the APA. Chapter 59, Laws of Maryland 1993. See SG § 10-226(c), Castrenze, 335 Md. at 287-88 n. 1.
[18] In some cases, due process may be satisfied through a "paper hearing," where the right to be heard is limited to the submission of documents and written arguments. Phillips v. Venker, 316 Md. 212, 218,557 A.2d 1338 (1989).
 *Page 226