**Alvin JONES, Plaintiff–Appellant,**

v.

**Dennis A. BAKER, et al., Defendants–Appellees.**

No. 97–3406.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 6, 1998.
Decided Sept. 15, 1998.

Gregory A. Gordillo (argued and briefed), Ulmer & Berne, Cleveland, OH, for Appellant.

Joshua T. Cox (argued and briefed), Office of Atty. Gen., Columbus, OH, for Appellees.

Before: MERRITT, KENNEDY, and GILMAN, Circuit Judges.

MERRITT, J., delivered the opinion of the court, in which KENNEDY, J., joined. GILMAN, J. (pp. 813–817), delivered a separate concurring opinion.

## OPINION

MERRITT, Circuit Judge.

Plaintiff Alvin Jones appeals a district court order granting summary judgment for defendants in his prisoner's civil rights action filed pursuant to 42 U.S.C. § 1983. Specifically, plaintiff alleges that his segregation from the general prison population for an excessive period of time involves the deprivation of a state-created liberty interest without due process in violation of the Fourteenth Amendment. For the reasons set forth below, we affirm.

### I.

Plaintiff is currently an inmate at the Mansfield Correctional Institute. His complaint against Ohio correctional facility officials seeks monetary damages and injunctive relief. Plaintiff alleges that he was improperly sentenced to disciplinary and administrative segregation for an excessive period of time, therefore depriving him of a liberty interest, and that the procedures used to place and keep him in segregation are deficient.

Plaintiff was an inmate at the Southern Ohio Correctional Facility during severe riots that erupted at the prison in 1993. Hostages were taken and nine inmates and one officer were murdered. Plaintiff was a maximum security inmate serving 15–25 years for aggravated robbery.

After the riot, plaintiff and 128 other inmates were transferred to Mansfield Correctional Institute. Upon their arrival, all inmates were placed in nondisciplinary segregation, known as Security Control, while the circumstances of the riot at the Southern Ohio facility were investigated by a special prosecutor. In June 1993, all the transferred inmates were then placed in Administrative Control, which is more re-

strictive than Security Control. In accordance with established procedures, each inmate was afforded an opportunity to be heard. At plaintiff's hearing he refused to speak. After negotiations with prison officials, the inmates were placed back in Security Control in late 1993 and their records expunged of the Administrative Control placements.

During the course of the investigation into the riots, inmates were placed back in the general prison population if and when they were cleared of wrongdoing. As a result of the investigation, plaintiff was implicated in the murder of the prison officer. The Department of Corrections decided that until the investigation was concluded and the allegations against plaintiff resolved, he should remain segregated from the general population for safety reasons.

In December 1995, the special prosecutor informed the Department of Corrections that he was no longer actively investigating criminal charges against plaintiff and the Department could pursue administrative charges against him. Based on the information the Department of Corrections had concerning plaintiff's complicity in the murder of the prison officer, plaintiff was charged with violating the administrative prison rule that prohibits criminal conduct.

A two-day hearing was held in January 1996 at which plaintiff and others testified. At the conclusion of the hearing, the Rules Infraction Board concluded that plaintiff and another inmate had strangled the prison officer. It was recommended that plaintiff be placed in Administrative Control thereafter.

## II.

■ The key issue presented in this case is whether plaintiff's confinement in administrative segregation from the time of his initial transfer to Mansfield Correctional Institute until the administrative hearing in January of 1996, a period of approximately two and one-half years, violated the Due Process Clause. Plaintiff has not challenged his continued confinement in administrative segregation since the January 1996 hearing.

■ In order to determine whether segregation of an inmate from the general prison population involves the deprivation of a state-created liberty interest protected by the due process clause, courts are to determine if the segregation imposes an "atypical and significant" hardship on the inmate "in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

■ Plaintiff contends that the extraordinarily long time during which he has been held in segregation establishes the "atypical and significant" hardship necessary under *Sandin* to create a liberty interest. First, administrative segregations have repeatedly been held not to involve an "atypical and significant" hardship implicating a protected liberty interest without regard to duration. *See, e.g., Rimmer–Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir.1995); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997). Second, we note that under Ohio law, administrative segregation may continue for an "indefinite time period." Ohio Admin. Code § 5120–9–13(A). Admittedly, few cases of segregation extend to the length of plaintiff's stay here. However, we agree with the district court that under *Sandin* a liberty interest determination is to be made based on whether it will affect the overall duration of the inmate's sentence and there is no evidence here that the segregation will impact plaintiff's sentence.

The "atypical" length of plaintiff's stay in administrative segregation is with good reason. First he was placed in security control with all other transferred inmates. He then remained in administrative segregation for the duration of the investigation into the riots in which he played a significant role. At the conclusion of the investigation it was determined, after a hearing, that he had violated a prison rule by committing murder.

It is not "atypical" for a prisoner to be in segregation while his or her participation in violent conduct inside the prison walls is investigated. While the length of time that plaintiff has been in segregation may be atypical, it was justified and does not lead to the conclusion that plaintiff suffered an "atypical and significant" hardship in relation to the ordinary incidents of prison life. When a prisoner is implicated in the killing

of a prison guard during a large prison riot, it is not unreasonable for corrections officials to make some adjustment in the conditions of his or her imprisonment until a full and thorough investigation is completed.

In addition, the record demonstrates that the conditions of plaintiff's confinement do not rise to an "atypical and significant" hardship. Plaintiff's stays in administrative segregation and security control were not much different than that experienced by other inmates in segregation.

In sum, because the administrative, nondisciplinary segregation at issue here does not deprive plaintiff of a liberty interest without due process, we affirm the district court. We note that our holding here does not mean that every administrative segregation regardless of length or the reason for the segregation will not implicate a liberty interest. The facts of this case and the extraordinarily good reasons for holding plaintiff in segregation form the basis for this decision.

For the foregoing reasons, we affirm the judgment of the district court.

GILMAN, Circuit Judge, concurring.

Alvin Jones spent more than two and a half years in administrative segregation, *i.e.*, solitary confinement, before the Ohio Rules Infraction Board held a hearing that concluded he should stay there because he was involved in the murder of a prison guard during a riot. Jones filed suit, claiming that his placement in administrative segregation for the period prior to the Board's decision violated his constitutional right to due process of law.

In order to decide whether a liberty interest has been implicated by an inmate's placement in solitary confinement, the Supreme Court requires us to examine the nature of that confinement to determine if it amounts to an "atypical and significant hardship."*Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The majority, in my opinion, has focused solely on the reason Jones was initially placed in administrative segregation (his suspected involvement in a major prison riot) rather than evaluate the conditions and duration of that confinement. Because I believe that Jones's confinement in administrative segregation for such a long duration was an "atypical and significant hardship," I disagree with the majority's conclusion that Jones was not deprived of a liberty interest. On the other hand, I concur in the majority's decision because I believe the deprivation of Jones's liberty interest was in accordance with the procedural requirements of the Due Process Clause of the Fourteenth Amendment.

## I. Liberty Interest

In order for an inmate to prevail on a procedural due process claim for his removal from the general inmate population, he must establish that (1) he enjoyed a protected liberty interest, and (2) that the process due him was denied. *See Board of Regents v. Roth*, 408 U.S. 564, 569–570, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). There are two sources from which a liberty interest may be derived: from the Due Process Clause in either the Fifth or Fourteenth Amendment, or from the rights conferred by the state through its regulations or statutes entitling the inmate to some modicum of freedom within the prison. *See Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (noting that a liberty interest "may arise from two sources—the Due Process Clause itself and the laws of the States"). Jones claims that his placement in administrative segregation for over two and a half years was in derogation of the statutory rights that Ohio has conferred upon its inmates, *i.e.*, a state-created liberty interest.

In the past, the Supreme Court had instructed the lower courts to examine whether the particular state law or regulation at issue contained "language of an unmistakably mandatory character requiring that certain procedures 'shall,' 'will,' or 'must' be employed."*Hewitt*, 459 U.S. at 471–72, 103 S.Ct. 864. If the statute or regulation used such mandatory language, then the state had created a protected liberty interest. *See Spruytte v. Walters*, 753 F.2d 498, 507–508 (6th Cir.1985).

The Supreme Court in *Sandin* abandoned this "mandatory language" analysis. It observed that *Hewitt*'s "mandatory language" formula drove courts to pour over the linguistic subtleties of prison regulations rather

than assess "the real concerns undergirding the liberty protected by the Due Process Clause." 515 U.S. at 483, 115 S.Ct. 2293. The *Sandin* Court found *Hewitt* to have produced two undesirable results: (1) states implemented very few prison regulations that provided guidance to its prison officials or, alternatively, conferred standardless discretion on its prison personnel so as to avoid the creation of liberty interests, and (2) the courts squandered valuable judicial resources by regularly immersing themselves in the day-to-day management of prisons. *See id.* at 482, 103 S.Ct. 864.

Disavowing the *Hewitt* analysis, *Sandin* refocused the methodology for determining when prison regulations confer a liberty interest on prison inmates, saying:

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 483–84, 115 S.Ct. 2293. Thus, to prevail on a procedural due process claim after *Sandin*, an inmate must establish that his confinement or restraint creates an "atypical and significant hardship" in relation to the ordinary degradations he must endure in prison. To measure whether the particular restrictions imposed on the inmate are atypical and significant, the courts should look to the following factors: "(1) the effect of [the segregation] on the length of prison confinement; (2) the extent to which the conditions of the [ ] segregation differ from other routine prison conditions; and (3) the duration of the [ ] segregation imposed compared to discretionary confinement." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998).

Jones does not claim that his prison sentence was extended by his confinement in administrative segregation. Instead, the core issue in this case centers on the degree and duration of the hardships imposed upon him by the administrative segregation. *See Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998) (*Sandin* "established an analysis under which the degree and duration of an inmate's restraint are the key considerations to determine the existence of a state-created liberty interest"); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996) (noting that the focus of *Sandin* is on the conditions of the inmate's confinement).

In determining whether particular restraints impose atypical and significant hardships, the duration of the confinement is a "critical factor in the *Sandin* analysis." *Wright,* 132 F.3d at 136 (noting that the district court did not conduct a proper *Sandin* analysis when it failed to consider the 288–day duration of the inmate's disciplinary confinement). The level of hardship imposed on an inmate can be "offset by the relative brevity" of the segregated confinement. *See Acre,* 139 F.3d at 337 (hardship caused by placement in administrative segregation was offset by the relative brevity, 18 days, of the confinement); *see also Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (12 days of pre-hearing confinement in administrative segregation did not give rise to a liberty interest).

Conversely, relatively minor hardships can give rise to a liberty interest when imposed for an extended period of time. *See McClary v. Kelly,* 4 F.Supp.2d 195, 210 (W.D.N.Y. 1998) (noting that "in deciding whether a deprivation imposed an atypical and significant hardship on a prisoner, [a court] must balance the nature and severity of the deprivations with the duration of those deprivations"). Moreover, to determine whether an inmate's placement in administrative segregation worked an atypical and significant hardship, the appropriate point of comparison is with the circumstances of confinement in the general prison population. *See Keenan,* 83 F.3d at 1089; *Justice v. Coughlin,* 941 F.Supp. 1312, 1324 (N.D.N.Y.1996) ("[T]he relevant comparison for *Sandin* purposes … is between inmates in [solitary confinement] and inmates in the general population."); *cf. Sandin,* 515 U.S. at 484, 115 S.Ct. 2293 (noting that a liberty interest arises when an inmate is exposed to an "atypical and significant hardship on the inmate *in relation to*

*the ordinary incidents of prison life"* (emphasis added)).

While the majority is correct in observing that it is not unusual to place an inmate in administrative segregation after his suspected involvement in a prison riot, such confinement for a period of over two and a half years is clearly a rare occurrence. The conditions of Jones's confinement, while not draconian, are certainly unlike those experienced by inmates housed outside of solitary confinement.

Inmates in the general prison population at the Mansfield Correctional Institute are given work assignments, freely interact with other inmates, participate in educational, vocational, and recreational activities, and eat their meals with other inmates. Inmates housed in administrative segregation, in contrast, have a noticeable curtailment in the degree of "freedom" enjoyed by non-segregated inmates. Jones, for example, did not have the benefit of receiving work assignments, educational and vocational opportunities, or the ability to freely interact with other inmates. In addition, Jones's recreational, visitor, telephone, and radio privileges were reduced. Jones was also required to eat his meals alone in a smaller cell. Given the length of time that Jones was forced to endure such a diminished level of freedom as compared to that experienced by other inmates in the general prison population, I would hold that a liberty interest arose that subjects his administrative segregation to a due process analysis. *See McClary v. Kelly,* 4 F.Supp.2d 195, 210 (W.D.N.Y.1998) (holding that a liberty interest existed when an inmate had been placed in administrative segregation for four years).

The majority, however, holds that no liberty interest existed in this case because (1) Jones was placed in administrative, as opposed to disciplinary, segregation and (2) Ohio's administrative regulations allow prison officials to place inmates in administrative segregation for indefinite periods of time. I find both reasons unpersuasive.

At issue in *Sandin* was the procedural due process rights of an inmate placed in segregation for disciplinary reasons. The Supreme Court concluded that the disciplinary confinement of an inmate for thirty days "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293. In so holding, the Court noted that the conditions found in disciplinary confinement "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and therefore the confinement was not "atypical" in relation to the "ordinary" or expected incidents of prison life. *Id.*

The majority in the present case asserts that administrative segregation in general is "typical" of what can normally be expected as an incident of prison life, so that such confinement does not normally give rise to a liberty interest. Other courts have agreed with this position. The Seventh Circuit, for example, has stated:

> Every state must have somewhere in its prison system single-person cells in which prisoners are sometimes confined not because they have misbehaved but simply because the prison has no other space, wishes to protect some prisoners from others, wishes to keep prisoners isolated from one another in order to minimize the risk of riots or other disturbances, wishes to prevent the spread of disease, and so forth. Almost 6 percent of the nation's prison inmates are in segregation and it appears that the great majority of these are not in disciplinary segregation; so even a prisoner who had committed a white-collar crime and had been assigned to the lowest security prison in the state's system might find himself in segregation for a nondisciplinary reason. Under *Sandin* this possibility is probably enough to prevent him from complaining successfully of a deprivation of liberty if he is transferred into segregation for a disciplinary infraction.

*Wagner v. Hanks,* 128 F.3d 1173, 1176 (7th Cir.1997) (citations omitted); *see Griffin v. Vaughn,* 112 F.3d 703, 706–08 (3d Cir.1997) (15 months confinement in administrative custody did not deprive the inmate of a liberty interest under *Sandin* ), and *Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) ("administrative segregation, without more, simply does not constitute deprivation of a protected liberty interest").

Such a broad categorical approach to resolving procedural due process claims, however, is in my opinion out of step with *Sandin*'s principal directive that courts should look to see if the *particular* inmate has been deprived of a state-created interest of "real substance." *Sandin,* 515 U.S. at 478, 115 S.Ct. 2293. As one district court has correctly noted:

> At its core, *Sandin* instructs courts to look at the nature and extent of the particular deprivation in deciding whether a protected liberty interest is implicated. Thus, it is the nature of the deprivation and not the reason for the deprivation that is central to the *Sandin* analysis. Of course, as *Sandin* makes clear, certain deprivations are a typical part of the normal incidents of prison life. In making a determination as to what is an "ordinary incident of prison life," it makes both legal and logical sense to take into account whether particular punitive deprivations are also found in non-punitive forms of prison confinement, such as administrative segregation or protective custody. But it makes little sense to hinge an individual's right to due process simply on the label prison officials choose to attach as the basis for the deprivation. Indeed, one of the reasons the Supreme Court rejected the "mandatory language" analysis of *Hewitt* was because it had the "undesirable effect" of discouraging States from codifying prison management procedures to avoid creating "liberty" interests thereby "conferring standardless discretion on correctional personnel." Similarly, a due process analysis that would allow correctional personnel to avoid the creation of "liberty interests" by simply assigning misbehaving inmates to a segregated confinement unit for "administrative" (as opposed to "disciplinary") reasons seems to encourage the same "standardless discretion" which the Supreme Court found offensive in *Sandin.* ... Whatever [an inmate's] due process rights may be, they should not be extinguishable simply by virtue of the fact that the confinement was labeled by prison officials as "administrative."

*McClary,* 4 F.Supp.2d at 199 (citations omitted).

The majority asserts as an alternative rationale for finding no liberty interest that, because the prison is authorized to place an inmate in administrative segregation for an unlimited period of time under Ohio law (not exceeding the inmate's sentence), placement in administrative segregation for more than two and a half years is not atypical. But the proper analysis should focus not on whether the prison was authorized to place Jones in administrative segregation for any particular length of time, but rather on determining the point at which the prison had to comply with the procedural safeguards provided by the Due Process Clause in order to keep him there. Unlike the majority, I believe that *Sandin*'s case-by-case approach mandates that we address the realities of the particular inmate's deprivation, rather than engage in a broad-brush analysis. *See Scott v. Albury,* 138 F.3d 474, 479 (2d Cir.1998) (noting that *Sandin* requires courts to focus on the actual length of time an inmate was kept in solitary confinement, not how long he could have been kept there).

## II. Process Provided

Jones argues that he was entitled to the due process protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The principles set forth in *Wolff,* however, only apply when the inmate is being subjected to disciplinary action, as opposed to segregation for administrative reasons. *See* 418 U.S. at 560, 94 S.Ct. 2963. Although under active criminal investigation during his administrative segregation, Jones was not charged with any prison rule violation until January 11, 1996, when the Board determined that he should continue in administrative segregation for murdering a prison guard. It is only after that point in time that the procedural protections provided in *Wolff* were triggered. Because Jones has not challenged his continued confinement in administrative segregation since the Board's decision, there is no need to determine whether Jones's continued confinement meets with the due process protections afforded by *Wolff.*

In contrast, the Court in *Hewitt* set forth the protections that the Due Process Clause

affords inmates who are placed in solitary confinement for administrative reasons. The Court held that in order to transfer an inmate from an already restricted environment (general prison conditions) to a more confining condition (solitary confinement) out of fear that the inmate poses a threat to prison security, an informal proceeding is sufficient to satisfy the Due Process Clause. As explained by the Court:

> [A]n informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily, a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Hewitt*, 459 U.S. at 476, 103 S.Ct. 864.

In the present case, Jones was provided such procedural protections when initially placed in administrative confinement. Prison officials advised Jones by letter of his change in status and told him that he would remain in that status during the pendency of the criminal investigation. Jones contends that because the prison did not comply with state administrative rules requiring periodic review, this establishes that no such review was provided. Jones's reliance on the particulars of Ohio's prison rules, however, is misplaced. The type of review that is required is dependent upon the particular circumstances of each case. *See Hewitt*, 459 U.S. at 472, 103 S.Ct. 864 ("The requirements imposed by the Clause are, of course, flexible and variable dependent upon the particular situation being examined"); *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) ("[T]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation"). When presented with a similar situation in *Hewitt*—a riot followed by an investigation—the Court addressed the periodic review issue as follows:

> Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner. *Likewise, the decision to continue confinement of an inmate pending investigation of misconduct charges depends upon circumstances that prison officials will be well aware of—most typically, the progress of the investigation. In both situations, the ongoing task of operating the institution will require the prison officials to consider a wide range of administrative considerations; here, for example, petitioners had to consider prison tensions in the aftermath of the December 3 riot, the ongoing state criminal investigation, and so forth.*

*Hewitt*, 459 U.S. at 477 n. 9, 103 S.Ct. 864 (emphasis added).

In the present case, the record is clear that Jones was segregated from the general inmate population because he remained under criminal investigation for the murder of a prison guard, and that the prison officials were kept fully apprised of the progress of the investigation by the special prosecutor. Because the review provided by prison officials, through the investigatory efforts of the special prosecutor, was in a very real sense continuous, I believe that Jones's confinement met with the procedural safeguards outlined in *Hewitt* and complied with Ohio's administrative rules. Accordingly, I would affirm the district court's judgment on that

basis rather than on the majority's conclusion that no liberty interest was implicated.