847 A.2d 450

**Joseph PATRICK**

v.

**SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL Services.**

No. 2423, Sept. Term, 2001.

Court of Special Appeals of Maryland.

April 2, 2004.

Reconsideration Denied May 21, 2004.

424

Joseph B. Tetrault (David C. Wright, Stephen Z. Meehan, Pauline K. White, on the brief), Chestertown, for appellant.

Alan D. Eason (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Panel: BARBERA,* GREENE, and CHARLES E. MOYLAN, JR., (Retired, specially assigned) JJ.

BARBERA, Judge.

This appeal stems from the transfer of appellant, Joseph Patrick, from the Maryland House of Correction Annex ("MHC–X"), a maximum security prison, to the Maryland Correctional Adjustment Center ("MCAC"), a supermaximum security prison. The Commissioner of the Division of Correction ("DOC") immediately ordered appellant's emergency transfer to MCAC when he was charged with attempted escape. At a subsequent disciplinary hearing, appellant was adjudicated not guilty of attempted escape.

When appellant was not transferred back to MHC–X after this adjudication, he initiated grievance procedures, arguing that he was entitled to a transfer back to MHC–X. Appellant's administrative and subsequent judicial review efforts have been unsuccessful, prompting the instant appeal.

Appellant presents the following questions for our review:

I. Is there a protected liberty interest in avoiding transfer to supermax?

II. Is the DOC bound by the fact-finding of its disciplinary hearing officer?

III. Is continued segregation of appellant without a factual basis arbitrary and capricious?

For the reasons that follow, we affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On April 26, 2000, appellant, an inmate housed at MHC–X, was charged with attempted escape from that facility. Later that day, appellant was transferred to MCAC. Correctional

---

* Greene, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; and participated in the adoption of this opinion as a member of this Court by special designation.

Officer Renee Cherry stated in the "Notice of Inmate Rule Violation and Disciplinary Hearing":

On April 26, 2000 I Ofc. Cherry was working D-building yard at approximately 9:15 a.m. [when] I observed an escape attempt. I noticed that inmate Joseph Patrick was standing in the back of the fence in the area where the escape took place. I radioed to control to report an escape in progress at which time inmate Patrick signaled to the inmates escaping in the grass. I called control. I Ofc. Cherry believe that inmate Patrick was a look-out man due to the fact [that] he was the only inmate in the area at the time of the escape while all others were on the other side of the yard. Inmate Joseph Patrick # 213–986 [1] is in violation of Rule 106.

Appellant appeared before a hearing officer at a disciplinary hearing on May 4, 2000. Two inmate witnesses testified on appellant's behalf. Both stated that appellant was not near the area of the attempted escape when it occurred. Officer Cherry did not testify. The hearing officer credited the testimony of appellant, determined that Officer Cherry's report was internally inconsistent, and found appellant not guilty of attempted escape.

Appellant thereafter requested a transfer back to MHC–X. When the Assistant Commissioner did not act upon that request, appellant filed a complaint with the Inmate Grievance Office ("IGO"). After the IGO determined that appellant's complaint met the preliminary criteria for a meritorious grievance, the IGO referred the matter to the Office of Administrative Hearings, entitling appellant to a hearing before an administrative law judge ("ALJ").[2]

Appellant represented himself at the grievance hearing on March 14, 2001. He argued that he was wrongly retained at MCAC because it had been determined by the disciplinary

---

1. Appellant's actual identification number is 273–986. He filed a motion to dismiss the charge at the disciplinary hearing based on this error. That motion was denied.

2. *See* Md.Code (1999), § 10–207 of the Correctional Services Article.

hearing officer that he was not guilty of escape or attempted escape. He specified that he was being punished for an act he had not committed, because he was now forced to remain at MCAC for at least two to three years as the result of the Assistant Commissioner's placing him in Transfer Category Three (about which we say more, *infra* ).

Appellant called as a witness Patricia Briggs, the supervisor of his MCAC case management specialist. Ms. Briggs discussed the two Division of Correction Directives ("DCD") that pertain to appellant in this instance. She explained that inmate transfers to MCAC are governed by DCD 100–161. That directive provides that the Assistant Commissioner approve a request by another facility for transfer of an inmate into MCAC. In appellant's case, that request for transfer was approved, and the Assistant Commissioner assigned appellant to Transfer Category Three. Ms. Briggs testified that, even though the disciplinary hearing officer had found appellant not guilty of a rule infraction, the Assistant Commissioner had the authority to make an independent decision that appellant should remain in Category Three.

Appellant asked Ms. Briggs whether DCD 100–161 permitted him "to be subjected to punishment [for an act] that he is not guilty of," to which she responded:

Mr. Patrick, let me just say this to you. You're talking about two different DCD's. When you talk about adjustments, you're talking about DCD 105. When you talk about transfers to MCAC, we're talking about 100–161 series which is two different DCD's. You're absolutely right in terms of, if you're found not guilty, and say you were on work release and you lost your job and found not guilty, then the Case Management Department would bring you up for reclass back to your original status.

But in this particular incident, coming to the super max, it's an entirely different DCD which is 100–161, that only the Assistant Commissioner makes the determination on whether [we] made a mistake. . . . [B]ased on the facts that were given to him, the documents that were sent to him by the Annex, he determined that you should remain here and

that you should remain in Category Three transfer category.

Ms. Briggs went on to explain that "[t]his has nothing to do with guilt ... this has to do with transfer and it clearly states transfer."

On June 12, 2001, the ALJ issued a proposed decision. In the findings of fact section of the proposed decision, the ALJ found that appellant had been transferred to MCAC under Category Three of DCD 100–161.[3] The ALJ stated that Category Three applies to inmates transferred to MCAC for escape or attempted escape and requires a minimum two-to-three-year retention at MCAC; Category Three inmates receive an annual review and may be transferred when they have served fifty percent of their time at MCAC; and appellant's status as a Category Three Transfer remained unchanged after his having been found not guilty of attempted escape by the disciplinary hearing officer.

The ALJ noted that Category Ten of DCD 100–161 applies to inmates who are transferred for behavior or suspected behavior that is believed to be "detrimental to institutional security or public safety," and that Category Eleven permits the transfer of an inmate by order of the Commissioner or pending an inmate's investigation. Categories Ten and Eleven require no minimum period of retention at MCAC before transfer. The ALJ also noted that only the Assistant Commissioner of the DOC (presumably as the Commissioner's designee) has the authority to change an inmate's transfer category.

Because the Commissioner has complete discretion in authorizing the transfer of appellant into and out of MCAC, the ALJ denied and dismissed appellant's grievance with respect to his request for a transfer to MHC–X. But, because the disciplinary hearing officer had found appellant not guilty of

---

3. Appendix 5 to DCD 100–161 identifies 11 transfer categories under which an inmate can be assigned upon transfer to MCAC. For each category, a time parameter is listed, which indicates the range of time that an inmate can be detained at MCAC.

attempted escape, the ALJ recommended that "the Division of Correction reconsider and correct his transfer category, so as to change him from a Category Three Transfer (escape or attempted escape), to a Category Ten or Eleven transfer." [4] By order dated June 19, 2001, the Secretary of the Department of Public Safety and Correctional Services ("Secretary") ordered, without comment, that the ALJ's proposed order be affirmed.

Appellant, represented by counsel, sought judicial review in the Circuit Court for Baltimore City. By order entered on December 10, 2001, the court affirmed the Secretary's order. On January 10, 2002, appellant filed an application for leave to appeal to this Court, pursuant to Maryland Rule 8–204.[5] On October 22, 2002, we granted the application and transferred the case to this Court's regular appeal docket.

## DISCUSSION

### I.

Appellant argues that he has a liberty interest, protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution,[6] in avoiding continued incarcera-

---

4. The ALJ explained her rationale for this recommendation:

 The testimony of Ms. Briggs and the Grievant clearly showed that he has been prejudiced by being erroneously categorized [as] an individual involved in an escape or attempted escape, given the limitations on his being able to be seriously considered for transfer out of MCAC outside the minimum two to three year time period set forth in DCD 100–161.

 The ALJ evidently had concluded that a change in transfer status from Category Three to Category Ten or Eleven would benefit appellant because, under the latter categories, whether and when to transfer appellant would be left to the discretion of the Assistant Commissioner.

5. Maryland Code (1999), § 10–210(c) of the Correctional Services Article provides that an inmate may only obtain review in this Court by filing an application for leave to appeal in accordance with the Maryland Rules.

6. The Due Process Clause of the Fourteenth Amendment states: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

tion at MCAC. In support of this claim, appellant directs us to the conditions and duration of his confinement at MCAC, which, he argues, encroach upon a protected liberty interest. Appellant rests much of his argument on what he characterizes as the "draconian" conditions of confinement at MCAC, as reflected by various DCDs and the regulation that spells out the level of security that exists at supermax facilities.

■ The Secretary points out as a preliminary matter that appellant failed to make a record before the ALJ that supports this contention, and we should therefore decline to address it. The Secretary, moreover, has filed a motion to strike portions of appellant's appendix, arguing that the DCDs and institutional bulletin contained in it are not law.[7] The Secretary maintains that, "absent the ALJ accepting into evidence or taking notice of them, [these documents] are not part of the record on judicial review, and may not be considered by this court." Relatedly, the Secretary asserts that appellant's argument, which is that these documents illustrate how the conditions in MCAC impose an atypical and significant hardship on him in relation to the ordinary incidents of prison life at MHC–X, is being made for the first time on judicial review.

We agree with the Secretary that appellant did not make any of the above-referenced materials part of the record below. We shall nonetheless deny the Secretary's motion to strike because the record reflects that appellant did attempt to have certain DCDs made part of the record before the ALJ, and she expressly declined to admit them into evidence. The ALJ said:

> I've just ruled on the admissibility—first of all, a DCD doesn't have to be admitted into evidence, you can refer to it. We have the DCD's in our office, that's law.

---

7. These documents are: DCDs 100–160, 100–162, 100–164, 100–166, 110–18, and 250–1; Department of Public Safety and Correctional Services Directive 105–5; and Maryland Correctional Adjustment Center Institutional Bulletin 02–08.

So you don't admit law, you admit facts and documents. If there is any debate about which DCD applies, I'll hear that argument, but I don't need to get a copy of the DCD anyway, but that particular DCD is not relevant to this case.

■ That appellant has prevailed on the motion to strike, however, brings him no ultimate relief, because the matters contemplated by the appendix material relate to an argument that he neither presented at the grievance hearing nor asked the ALJ to consider. Consequently, the issue is not preserved for our review. Md. Rule 8–131(a).

■■ Under Maryland law, a party is bound by the theory the party pursues before the administrative body, and the failure to present an argument precludes it from being heard by the reviewing court. *State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 699–700, 818 A.2d 259 (2003). "Moreover, a reviewing court is restricted to the record made before the administrative agency, and is confined to [deciding] whether, based upon the record, a reasoning mind reasonably could have reached the factual conclusion reached by the agency." *Maryland State Ret. and Pension Sys. v. Martin,* 75 Md.App. 240, 246, 540 A.2d 1188 (1988).

Appellant argued at the administrative level that he was deprived of due process because his classification as a Category Three Transfer meant that he would not be considered for transfer to another facility for at least two years and as much as three years, and that this was punishment for an act of which he was found to be not guilty. Even if we were to construe appellant's argument before the ALJ broadly enough to encompass the argument he now makes, namely that he has a protected liberty interest in avoiding continued incarceration at a supermax prison, the argument rests entirely on the conditions of confinement at MCAC as reflected by various DCDs and the regulation that spells out the level of security that exists at supermax facilities. Yet, appellant presented no evidence regarding those conditions; more important, he pre-

sented no evidence to show how they differed markedly from the conditions he faced while incarcerated at MHC–X.

■ In short, the way in which appellant chose to litigate his grievance—the evidence he presented and the arguments he made—set the scope of the ALJ's findings of fact, conclusions of law, and proposed decision. Our review of the Secretary's order adopting the ALJ's proposed decision is narrowly circumscribed by the record before the ALJ, precluding us from deciding the complaint appellant raises here.[8]

Notwithstanding appellant's failure to preserve the issue for our review, we shall take this opportunity to comment upon it. We do so because of the dearth of Maryland cases on the subject of what constitutes an inmate's protected liberty interest since the United States Supreme Court modified the test for analyzing such questions in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In *Sandin*, the Supreme Court "reexamine[d] the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause." *Id.* at 474, 115 S.Ct. 2293. The Court abandoned the methodology it had developed in its prior decision of *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), because that methodology has led the courts to "stray[ ] from the real concerns undergirding the liberty protected by the Due Process Clause." 515 U.S. at 483, 115 S.Ct. 2293.

The Supreme Court had instructed the courts in *Hewitt* to examine whether the particular state law or regulation at issue contained "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed." 459 U.S. at 471, 103 S.Ct. 864. If the statute or regulation used such mandatory language, then the state

8. We cannot determine what arguments were presented to the circuit court because appellant has had transcribed only the court's ruling at the end of the hearing on judicial review. This is of no consequence, however, because we look to the record developed at the agency level. *Maryland State Ret. and Pension Sys. v. Martin*, 75 Md.App. 240, 246, 540 A.2d 1188 (1988).

had created a protected liberty interest. *Id.* at 472, 103 S.Ct. 864.

The Supreme Court abandoned in *Sandin* this "mandatory language" approach because it prompted courts to scrutinize the language of the relevant statutes and regulations to ascertain whether they created a protected liberty interest. The Court concluded that the *Hewitt* methodology "produced at least two undesirable effects." 515 U.S. at 482, 115 S.Ct. 2293. "First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment." *Id.* "Second, the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.*

The Supreme Court declared in *Sandin* that "[t]he time has come to return to the due process principles we believe were correctly established and applied in *Wolff* [*v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ] and *Meachum* [*v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ]." *Id.* The Court made clear

> that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these *interests will be generally limited to freedom from restraint which,* while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* at 483–84, 115 S.Ct. 2293 (internal citations omitted) (emphasis supplied).

■ Even under *the Hewitt* methodology that predated *Sandin,* however, "[a] transfer of a prisoner from one institution to another, of course, does not implicate a liberty interest in the absence of a state statute or regulation that creates such an interest." *Paoli v. Lally,* 812 F.2d 1489, 1492 (4th Cir.), *cert. denied,* 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 137 (1987). No Maryland statute or regulation existing at the

time of *Paoli* created such a protected interest. *See id.* at 1493. And, as far as we can discern, no statute or DOC regulation promulgated since *Paoli* would create a liberty interest in an inmate's transfer from one institution to another, even if the *Hewitt* methodology remained viable in the post-*Sandin* era.[9] To the contrary, the relevant DCDs make clear that "the Commissioner or the Commissioner's designees retain the discretion to modify the classification and/or assignment of any inmate at any time for any reason." DCD 100–005.II.T; *see also Watkins v. Secretary, Dep't of Pub. Safety and Corr. Servs.*, 377 Md. 34, 36, 831 A.2d 1079 (2003) (discussing same).

 Even if the reasoning and holding of *Paoli* were not enough to foreclose appellant's argument, the test formulated in *Sandin* does. As we have said, *Sandin* returns the protected liberty interest analysis to one that examines the nature of the conditions themselves, not the statute or regulation that creates them. And, the Supreme Court has made clear that transfer from one institution to another, even one that has more burdensome conditions, is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Fano*, 427 U.S. at 225, 96 S.Ct. 2532. A protected liberty interest is implicated only if the conditions existing at the facility where the inmate is housed are so "atypical" that exposure to them for a significant time "impose[s] a significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84, 115 S.Ct.

---

**9.** Because the *Hewitt* methodology is no longer employed in determining whether conditions of incarceration implicate a protected liberty interest, appellant cannot successfully rely either on *Hewitt*, or on *Angell v. Henneberry*, 92 Md.App. 279, 607 A.2d 590 (1992), which grounded its protected liberty interest analysis on *Hewitt, see id.* at 292–96, 607 A.2d 590. Indeed, to the extent that appellant's due process argument asks that we scrutinize specific prison regulations for whether they create a protected liberty interest by placing substantive limitations on the exercise of the Commissioner's discretion to approve transfers, we would decline to do so (if we were deciding the merits of appellant's complaint), since that is precisely what the Supreme Court in *Sandin* directs us not to do.

2293. Numerous cases stand for the proposition that unpleasant, even deplorable, prison conditions do not automatically trigger a protected liberty interest.

 Illustrative is *Beverati v. Smith,* 120 F.3d 500, 504 (4th Cir.1997). In that case, the United States Court of Appeals for the Fourth Circuit, reviewing the grant of summary judgment in favor of the prison officials, declined to find a liberty interest despite the court's accepting, as fact, inmate affidavits attesting that "their cells were infested with vermin; were smeared with human feces and urine; [ ] were flooded with water from a leak in the toilet on the floor above"; were so filthy that they had to use their clothing and shampoo to clean the cells; and were extremely hot. The inmates further alleged that their food was served cold and in smaller portions; they did not receive clean clothing, linen, or bedding in accordance with the regulations; they were not permitted to leave their cells the number of times per week allotted by the regulations; and they were provided with no educational or religious services. *Id.* The Court held that "although the conditions were more burdensome than those imposed on the general prison population, they were not so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life." *Id.*

Other cases are to like effect. *See Resnick v. Hayes,* 213 F.3d 443, 448, 448 n. 3 (9th Cir.2000) (concluding that an inmate failed to state a claim of a violation of a protected liberty interest resulting from his placement in disciplinary segregation, where the "recreational opportunities and access to showers are limited; the mattress is flat and dirty; no pillow is allowed; a prisoner cannot have access to the library; and half the time the food is cold," because the inmate failed to demonstrate that these conditions were worse than those in the general population); *Sealey v. Giltner,* 197 F.3d 578, 587, 589 (2d Cir.1999) (holding that the *Sandin* standard had not been violated based on the inmate's claim that he was subjected to 101 days of administrative segregation during which he was confined to his cell for 23 hours a day with 1 hour outside

his cell for recreation, limited to three showers per week, allowed to speak with inmates outside his cell only at certain times of the day, and subjected to other inmates' throwing feces at him); *Neal v. District of Columbia,* 131 F.3d 172, 175 (D.C.Cir.1997) (holding that an inmate did not establish the existence of a liberty interest based on his claim that he "involuntarily" spent six months in "voluntary" protective custody, "was allowed to leave his cell for nine hours a day three days a week, for six and a half hours (or longer if he had a visitor) for two days a week, and for five and six hours respectively on the remaining two days," but "did not have easy access to the gym, mailroom, law library, or medical unit (although other arrangements were made for provision of these services), and he could not work at a prison job"), *cert. denied,* 525 U.S. 812, 119 S.Ct. 46, 142 L.Ed.2d 35 (1998).

The conditions listed in the DCDs appellant cites on appeal include the requirements that MCAC inmates receive evaluations by a psychologist once every four months, obtain permission to possess a radio or television even in the general population of MCAC, receive no more than five visitors per month and no more than two visits per month for inmates in disciplinary segregation (all of which are non-contact unless the visitor is the inmate's attorney), worship only in one's cell, participate in recreation one hour a day on weekdays only, and submit all outgoing mail, legal and non-legal, to the authorities unsealed. *See* DCDs 100–160, 100–162, 100–164, 250–1; DCD Change Notice 11–00. Appellant also cites the restricted movement of inmates within MCAC, restrictions on personal clothing, and limitations on books in an inmate's cell, *see* DCD 100–166, as well as the significant security measures taken there, including handcuffing, pat downs, and strip searches, DCD 100–164; COMAR 12.02.08.01B(11).[10]

---

**10.** COMAR 12.02.08.01(11) provides:

"Super maximum security" means the highest security level. A super maximum security institution provides secure housing within a secure perimeter. Features include single-celling, extremely limited institutional movement, constant observation, and limited inmate-to-staff and inmate-to-inmate contact to control the behavior of an

Certainly, there is nothing about these conditions, in and of themselves, that would lead us to conclude as a matter of law that the conditions implicate a protected liberty interest. Moreover, given the absence in the record of *any* evidence of conditions at MHC–X, the facility from which appellant came and to which he wishes to return, we cannot know whether conditions at MCAC impose atypical and significant hardship on appellant in relation to the ordinary incidents of prison life. All that we do know is that the ALJ found that "MCAC is the most secure prison facility in Maryland, allowing its inmates far less flexibility that other maximum security institutions, e.g., with respect to work and recreation." Under *Sandin* and *Fano*, this finding is not enough to establish a protected liberty interest.

 Finally, we do not read appellant's argument to be that the duration of his stay at MCAC alone implicates a protected liberty interest.[11] If he is making such an argument, it fails for two reasons. First, it was not raised before the ALJ. *Kaydon*, 149 Md.App. at 699–700, 818 A.2d 259. Second, the law does not support the claim in any event.

Long terms of disciplinary or administrative segregation, alone, generally do not implicate a liberty interest under *Sandin. See, e.g., Jones v. Baker*, 155 F.3d 810, 812 (6th Cir.1998) (determining that the inmate's detention in administrative segregation for two and a half years, pending investigation of his involvement in the murder of a prison guard, was justified in view of the severity of the charges against him); *Bonner v. Parke*, 918 F.Supp. 1264, 1270 (N.D.Ind.1996) (finding that the prisoner's "placement in disciplinary segregation

---

inmate who has demonstrated an inability to be housed in an institution of lesser security.

*See also* DCD 100–160 (discussing the "intensive and specialized staff supervision and more restricted confinement" at MCAC). Appellant refers to his confinement at MCAC as "solitary confinement." The nature of confinement described in COMAR 12.02.08.01B(11), in our view, is not exactly "solitary."

11. As of the time we granted appellant's application for leave to appeal, he had been housed at MCAC for two years.

for three years [for fighting with another inmate] does not constitute an extreme term of segregation and, by itself, does not create an atypical and significant hardship in relation to the ordinary incidents of prison life"); *Carter v. Carriero*, 905 F.Supp. 99, 104 (W.D.N.Y.1995) (finding that a penalty of 270 days in disciplinary segregation did not implicate the inmate's liberty interest, given that the duration of confinement did not exceed the penalty imposed for similar forms of administrative confinement). *Cf. Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir.2000) (declaring that the inmate's detention in administrative custody for nearly eight years was "atypical" and subjected him "to conditions that differ significantly from 'routine' prison conditions in Pennsylvania state institutions," but concluding that, although the inmate's liberty interest had been adversely affected, he was not denied due process under the Fourteenth Amendment); *Koch v. Lewis*, 216 F.Supp.2d 994, 1001 (D.Ariz.2001) (finding that the inmate's detention in solitary confinement, ordered solely because of his gang affiliation, did violate his liberty interest, given that the detention involved "draconian" conditions and had lasted for more than five and a half years (with no prospect of a transfer)).

In sum, even if appellant's due process challenge were properly before us, it would fail on its merits because the regulations upon which he relies would not alone have established a violation of a protected liberty interest. It follows that, on this record, appellant did not carry his burden of proving, by a preponderance of the evidence, *see* COMAR 12,07.01.09A, that the agency acted arbitrarily, capriciously, or inconsistent with the law, *see* COMAR 12,07.01.09C,[12] in denying his request for a transfer back to MHC–X.

---

**12.** COMAR 12.07.01.09C states:

(1) In reviewing claims relating to administrative decisions, including but not limited to classification matters, the administrative law judge shall affirm the decision unless it is arbitrary and capricious, or inconsistent with the law.

(2) A failure to comply with applicable directives and regulations in reaching the administrative decision renders the decision arbitrary and capricious or inconsistent with the law only if the applicable

## II.

▆▆▆ Appellant raises the separate claim that his continued confinement at MCAC "was and is invalid" because the DOC is bound by, but ignored, the disciplinary hearing officer's fact findings pursuant to COMAR 12.07.01.09B(1). This argument is without merit.

COMAR 12.07.01.09B establishes the standard by which the ALJ reviews disciplinary proceedings. Subsection (1) of that regulation provides:

In reviewing a case upon the evidence, the decision rendered in a disciplinary proceeding shall be affirmed so long as the decision is based upon substantial evidence. The administrative law judge may not substitute judgment on factual matters for that of the trier of fact who has the ability to observe witnesses and to weigh credibility.

The standard of review cited by appellant, however, pertains only to disciplinary hearings. There is a separate standard of review for institutional administrative decisions in COMAR 12.07.01.09(C). As we have mentioned, the Assistant Commissioner's transfer decision requires reversal only when it is "arbitrary and capricious, or inconsistent with the law."

The matter before us did not arise out of the disciplinary hearing officer's adjudication of appellant's attempted escape charge. Rather, the issue on appeal stems from a separate hearing pursuant to appellant's complaint with the IGO concerning the Commissioner's refusal to transfer appellant back to MHC–X.

The Secretary states: "[Appellant's] adjustment hearing was for the purpose of determining whether he could be disciplined for a DOC rule infraction. The finding that he was not guilty of the infraction did not control the DOC's determination of the institution in which he could be housed consistent with public safety." We agree.

---

regulation or directive was intended to confer a procedural benefit on the grievant and there is prejudice to the grievant.

This precise point was made during the testimony of Case Management Supervisor Briggs, who stated at appellant's administrative hearing that adjustment hearings are governed by the DCD 105 series and institutional transfers are controlled by the DCD 100 series. Ms. Briggs explained that a finding of not guilty by the disciplinary hearing officer at an adjustment hearing, for example, may restore an inmate's work release privileges. Institutional transfers, according to Ms. Briggs, are "entirely different" because only the Assistant Commissioner determines whether an inmate is transferred to MHC–X. Here, the facts and documentation provided to the Assistant Commissioner by the MHC–X warden led him to conclude that appellant should remain at MCAC.

We therefore reject appellant's contention that the Commissioner was bound by the fact finding of the disciplinary hearing officer in making the entirely separate, discretionary determination that appellant, at least for now, should remain at MCAC.

### III.

Appellant claims that, "[o]nce the factual underpinning for the transfer decision was determined to be baseless, the transfer decision should have been promptly reconsidered." He asserts that his prolonged detention at MCAC after he advised the Assistant Commissioner of his not guilty adjudication by the disciplinary hearing officer was arbitrary and capricious.

We restate that it was appellant's burden to prove by a preponderance of the evidence that the Commissioner's decision to have appellant remain at MCAC was arbitrary, capricious, or inconsistent with the law. The ALJ concluded that appellant had not met that burden, and we see no cause to disturb that conclusion.

Section III.C. of DCD 100–161 affords a warden or assistant warden the discretion of requesting an emergency transfer to MCAC when an inmate "poses a clear and present danger to the safety and security of the institution or to other inmates."

Appellant does not contest the validity of his emergency transfer; rather, as we have said, he argues that the Assistant Commissioner acted arbitrarily and capriciously in refusing to approve a transfer back to MHC–X despite appellant's having been adjudicated not guilty by the disciplinary hearing officer.

Appendix 5 to DCD 100–161 lists the 11 transfer categories under which an inmate can be assigned upon transfer to MCAC. Category Ten permits transfer to MCAC for "[b]ehavior or suspected behavior which [is] detrimental to institutional security or public safety," and Category Eleven permits a transfer "[b]y order of the Commissioner or pending investigation." Categories Ten and Eleven afford the Assistant Commissioner sole discretion in determining whether to detain an inmate at MCAC.

At the time the Assistant Commissioner received the request from the warden at MHC–X to transfer appellant to MCAC, he was presented with Officer Cherry's report and a transfer form completed by the warden. The transfer form contained details that were not included in Officer Cherry's report, namely that the charged offense involved an attempted escape in which escape paraphernalia had been confiscated and the escapees detained. The form also stated that appellant "was observed placing escape paraphernalia by back fence area by officer."

At the administrative proceedings, appellant refuted the accuracy of this last assertion, and he claimed that this allegation pertained more broadly to all of the individuals involved. He further asserted that if Officer Cherry had witnessed appellant placing escape paraphernalia near the fence, her report would have stated as much.

Despite appellant's assertions, the ALJ concluded that the Assistant Commissioner's decision to make an institutional transfer is "purely discretionary." The ALJ went on to conclude that appellant failed to meet his burden of proving that the Assistant Commissioner acted arbitrarily and capriciously.

■ "A court reviewing a decision of an administrative agency generally is limited to determining whether there was substantial evidence on the record as a whole to support the agency's findings of fact and whether the agency's conclusions of law were correct." *Motor Vehicle Admin. v. Lytle*, 374 Md. 37, 56, 821 A.2d 62 (2003) (footnote omitted). Applying that standard here, we hold that there was substantial evidence to establish that the Assistant Commissioner's transfer decision concerning appellant fell within the scope of discretion accorded him by Maryland Code (1999), § 9–103 of the Correctional Services Article and DCD 100–161, and, therefore, was not arbitrary or capricious.

Finally, we fail to see how appellant is entitled to any different result by challenging the accuracy of Ms. Briggs's testimony that "MCAC has no discretion to retransfer the prisoner until the mandatory minimum sentence has been served." This, appellant argues, conflicts with DCD 100–161, which provides that "[t]he Commissioner has the authority to issue, change, or rescind any and all directives pertaining to MCAC. The Commissioner also has the authority to modify, suspend, or terminate an inmate's status at MCAC at any time for any reason."

Even had Ms. Briggs misstated the Commissioner's discretion, the fact remains that the Commissioner does have broad discretion to make transfer decisions. Furthermore, as we have said, the evidence offered by appellant did not establish by a preponderance of the evidence that, in exercising such discretion, the Commissioner acted arbitrarily or capriciously, or inconsistently with the law, by declining to act upon appellant's request to be transferred back to MHC–X.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**